# THE ENTERPRISE MANUFACTURING COMPANY *vs.* OPPENHEIM, OBERNDORF AND COMPANY.

*Contract for Purchase of Goods to be Delivered and Paid for in Monthly Instalments—Right to Rescind for Defects in Goods Delivered—Delay in Rescission—Use of Goods in Defective Delivery—Waiver.*

When a purchaser orders from a manufacturer goods of a described kind, which are known in the trade to possess certain qualities, the same being a material part of the description, he is entitled to reject goods offered which do not possess those qualities.

When a contract calls for the delivery of certain goods in monthly instalments, each instalment to be paid for monthly, the failure of the buyer to pay for an instalment as stipulated entitles the seller to rescind the contract as to future deliveries, and the failure of the seller to make delivery of an instalment, or the substitution of inferior goods in a delivery, entitles the buyer to rescind the contract. It makes no difference whether such breach of the contract occurs at the beginning of the performance or afterwards.

The right of a buyer to rescind a contract for the purchase of goods to be delivered in instalments, if inferior goods had been substituted in a delivery, is not waived or lost unless he delays for an unreasonable time in notifying the seller of his purpose to rescind after he acquires knowledge of the defects in the delivery; nor is the right to rescind lost because the buyer made use of such defective goods before having knowledge of the defect.

Defendants agreed to buy nearly two million yards of plain sheetings of a designated size and weight, to be manufactured by the plaintiff company, under a contract which, as subsequently modified, provided that two hundred and fifty

thousand yards should be delivered in each month, in equal weekly instalments according to buyer's shipping directions, which were to be paid for within a designated time. It is customary for buyers of such goods, which are known in the trade as grey goods, to send them to a finishing mill to be bleached and processed, or converted, or printed. When such goods go from the manufacturer to the finishing mill, the only inspection usual or practicable is made at the mill manufacturing them, and no inspection of the bales is made at the finishing mill before beginning to process. Defects in such sheetings consist of drop threads, thick and thin places, misweaves, oil stains, etc. These defects are magnified in processing and greatly diminish the value of the finished product. The plaintiff company made four shipments of the sheetings mentioned in the contract to the finishing mill, when defendant notified them that they cancelled the contract on account of defects just discovered in the goods already shipped. Defendants had at the time paid for the last three shipments which had been processed, but had not used the first shipment. This they offered to return. Plaintiff company claimed in this action the contract price for the goods already made and the balance due on the goods delivered and damages for defendant's breach of the contract. *Held,* that the evidence shows that the defects in the sheetings delivered were such that the goods did not comply with the contract, which called for sheetings known in the trade as "firsts".

*Held,* further, that this failure to deliver the kind of goods called for entitled the defendants to rescind the contract.

*Held,* further, that this right to rescind was not lost or waived because the defendants had caused the goods contained in three of the shipments to be processed, since the defects in them were not discovered until after the processing had taken place, and the defendants acted with reasonable promptness after the discovery of the defects.

*Held,* further, that consequently the plaintiff company is not entitled to recover in this action.

*Decided January 11th, 1911.*

Appeal from the Superior Court of Baltimore City (HAR-LAN, C. J.).

The cause was argued before BOYD, C. J., PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*Edgar Allan Poe,* for the appellant.

1. On December 21, 1907, when the appellees recognized the contract with the appellant as still in force by agreeing to and accepting a modification thereof, they knew, or had every means of ascertaining, the character of the goods that were being furnished by the appellant under said contract and had been put upon full inquiry, and their election on that day to treat the said contract as still subsisting was therefore final, and their right to rescind for a prior default was extinguished. In *Cole* v. *Hines,* 81 Md. 479, this Court said: "A party cannot take two inconsistent positions. If he has a right either to rescind a contract on account of a breach by the other party, or to continue it in force, and he elects to continue it in force, he thereby abandons the right to rescind and is bound by the election so made." See also *Groff* v. *Hansel,* 33 Md. 111.

So also in *Weaver* v. *Shriver,* 79 Md. 350, where it was alleged that the plaintiff had been induced through false representations to purchase certain shares of stock, the Court, reaffirming *Groff* v. *Hansel,* added: "If after the discovery of the alleged fraud the plaintiff treated the contract as still in force, and we think there is sufficient proof in the record to justify the jury in finding that he did so, such ratification would only have the effect of preventing a subsequent rescission."

If we apply these well-known principles, so clearly laid down by this Court, to the facts in this case, it is difficult to perceive on what possible theory the Court below held as a matter of law that the appellees were entitled to rescind the

contract on the 23d day of December, 1907. Certainly it should have been left to the jury to determine the questions of fact, involved, to wit: Whether, on December 21, when the appellees accepted and agreed to a modification of the contract they knew, or having been put upon full inquiry, should have known that the appellant had failed to comply with the requirements of the contract.

What new fact was brought to the attention of the appellees between Saturday, December 21st, when they recognized the contract as still subsisting by agreeing to the modification, and Monday, December 23d, when they attempted to rescind it? None whatever. No new bales arrived; no new samples put in an appearance. The only suggestion that might be offered, though there is no evidence to support it, is that a more thorough examination of the one bale on hand was made. Such an additional examination, in the circumstances, however, would not be sufficient legal justification for a change in the attitude of the appellees. They had had the bale since December the 17th, having sent for it for the express purpose of examining it. It took but an hour and a-half to make a complete examination, and such complete examination had been made several times by several persons prior to December 21st.

On the 21st of December Oppenheim had notice of certain defects in the goods that had been shipped. He knew they were serious; so serious, indeed, that upon further reflection, two days later, without any additional information, he made up his mind that he would risk a cancellation of the contract. Certainly he cannot complain if it is held that the same knowledge which would justify him in rescinding the contract would estop him from repudiating an election deliberately made. It may be that Oppenheim, in thinking the matter over on Sunday, reached the conclusion that the defects which had been discovered gave him a legal excuse for getting rid of what had turned out to be a most disadvan-

tageous contract, and that this idea had not occurred to him on the preceding day. This, however, is not the point. The question is merely one of election with knowledge or with means of knowledge.

2. On December 21st, a new contract was entered into between the appellant and appellees based upon a valuable consideration, and the appellees could only be released from the obligations resulting therefrom by some breach on the part of the appellant occurring subsequent to December 21st.

The original contract provided for the delivery of the goods at the rate of 350,000 yards monthly, in November, December, January, February and March. In October, 1907, there was a financial panic, due to the failure of the Knickerbocker Trust Company of New York and other financial institutions. The customers of the appellees began arbitrarily to cancel orders and, in consequence thereof, the appellees were in a tight place, were very much worried and embarrassed, and could not afford to be crowded. The appellant was accordingly requested to modify materially the original contract. This, of course, meant a pecuniary loss to it. It modified, however, the contract by postponing one month's shipment entirely and thereafter cutting down the shipments to such an extent that the time of the completion of the contract was postponed for three months. The result of this was, of course, that the appellant would be kept out of a large part of the purchase price during that time, although, as the appellant stated in one of its letters, "it took money to run a cotton mill."

On December 21st, therefore, when the final modification was affected, a new contract was made between the parties. *Linz* v. *Schuck,* 106 Md. 220:

This being so, the appellees manifestly had the right to rescind this new contract of December 21st only. 1. Because of fraud practiced in the procuring of the contract. 2. Because of a breach of its terms by the appellant.

There is no pretence or claim that any fraud was practiced in the securing of the new contract. In what way was there any breach of any of its terms by the appellant? No deliveries were to be made until January 1st, and there was nothing therefore for the appellant to do until January 1st.

The appellant gave no notification to the appellees of any intention on its part not to be bound by the terms of the contract which, of course, would have justified the appellees in rescinding, but on the contrary, at all times tendered itself ready and willing to furnish the goods specified both as to qualify and quantity, and at the trial proved by conpetent witnesses its ability to make proper deliveries.

All the testimony of the appellees bore upon the character of the goods in the first four shipments, which goods were in no way involved in the new contract of December 21st, and no attempt was made by the appellees to in any way impeach the testimony offered on behalf of the appellant as to the character of the goods covered by the invoices beginning January 1, 1908.

3. The goods called for by the first four shipments were accepted by the appellee, and the right to rescind the contract on account of defects in said goods was thereby lost. It is conclusively established in Maryland that the acceptance of goods precludes the party so accepting from afterwards rescinding the contract on account of any defects existing in the goods themselves. In *Central Trust Company* v. *Arctic Machine Company,* 77 Md. 237, 238, this Court says:

"The acceptance of the machines was no waiver of this warranty and does not deprive the purchaser of the right to sue on the warranty, or to rely by way of defence upon a counter-claim or recoupment in the vendor's action for the price, if the machines were defective in material and workmanship. It has been held that this is so whether the defect be latent, patent or discoverable. "An acceptance does no

more than preclude the purchaser from rescinding the contract and returning the property."

So also in *Kernan* v. *Crook, Horner & Company,* 100 Md. 222, where the Court said: "If he once accepted these articles he could not afterwards reject them nor rescind the contract. *Cole* v. *Hines,* 81 Md. 476." "If they proved to be defective or unsound or did not reasonably or substantially answer to the representations made at the time of their sale to him and he suffered any loss or damage therefrom, he was entitled to rely on those facts by way of defence or recoupment and thereby diminish the amount of the recovery against him."

The inquiry therefore resolves itself into whether the appellee accepted the goods or any of them in the first four shipments, or whether there was any evidence in the case from which the jury could have found such acceptance? The lower Court took the view that there was no evidence of acceptance. The appellant's contention below was, and it is repeated here, that there was not only evidence from which a jury could and should have found acceptance but that the evidence was of such a character as to amount to acceptance in law.

The goods were shipped, according to instructions, to an eastern bleachery, where, under orders from the appellees, as owners of the goods, the character of the goods, in all but the first shipment, was changed. Afterwards the appellees, as such owners, sell large quantities of them, and make delivery, and convert the balance into shirts, thus putting it absolutely beyond their power to make restitution. What better evidence can be produced showing acceptance? Was not the changing of the character of the goods, followed by the selling of them, the exercise of acts of ownership over them, and acts of wrong, if the appellees were not the owners of the goods, but of right if they were the owners of the goods? Was not the doing of those acts by the appellees

absolutely inconsistent with every other hypothesis, except that the goods were theirs, and how could they have been theirs unless they had accepted them?

The appellees attempted to meet this argument by claiming that the character of the goods was inadvertently changed before they could have ascertained that the goods were not such as they had ordered, and that in so changing the character of the goods they were not guilty of a breach of duty to inspect the goods. There is no such thing in law as duty to inspect. The vendee has the right to inspect, but it is a right which he may waive, and frequently does waive, relying upon performance by the other party to the contract. He waives this right, however, at his peril, and if he afterwards discovers that his confidence has been misplaced he must bear the legal consequences. He is not without redress, however. He is merely deprived of a certain redress, to wit: the right to rescind the contract. His right of recoupment still remains.

Acceptance of the goods, by the appellees, is shown not only by their conduct, but also by their own words. As especially bearing upon acceptance of the goods contained in the first shipment, the attention of the Court is directed to the case of *Cream City Glass Company* v. *Friedlander,* 84 Wis. 53, where the Court held that after the vendee of the goods had decided that they were not fit for the purposes for which they were purchased, and had notified the vendor of his decision and of his rejection of the goods, he could not, thereafter, use a portion of them in making a practical test for the purpose either of determining the question of their fitness or of providing evidence of their unfitness, and still insist upon the right to reject them.

Upon the subjects generally of acceptance, the right of inspection, and the extinguishment of the right to rescind after acceptance, see *Meechem on Sales,* Ch. VII, and especially sections 1375, 1380, 1387, 1391, 1393, 1398 and

1399. *Waukesha Canning Company* v. *Horn & Company,* 138 Ill. Apps. 564; *Henderson Elevator Company* v. *North Georgia Milling Company,* 126 Ga. 279; *Fox* v. *Wilkinson,* 14 L. R. A. (N. S.) 1107; *Lawder Co.* v. *Mackie Grocery Co.,* 97 Md. 14; *Mason et al.* v. *Smith et al.,* 130 N. Y. 480.

4. The failure of the appellees to return, or to offer to return, the goods furnished under the first four shipments precluded the appellees from rescinding the contract.

It is admitted that the appellees never attempted to return, and never offered to return any of the goods contained in the second, third and fourth shipments, although it is contended that sometime after the attempted rescission of the contract, on December 23, 1907, Woodward, Baldwin & Co., were notified that the goods in the first shipment were at their disposal. Even as to these goods, however, the appellees, after said notification, continued to exercise acts of ownership by giving shipping instructions, and by numerous examinations of them.

In *Horner* v. *Parkhurst,* 71 Md. 116, the Court, in speaking of the right to rescind, states the law, as follows: "If there was an express warranty that the benzine should be sixty-eight degrees specific gravity, and it turned out to be an inferior quality, then to entitle the defendant to a rescission of the contract, it was incumbent on him to return, or to offer to return it to the plaintiffs within a reasonable time after he discovered its quality; and if he failed to do so, the plaintiffs were entitled to recover the market value of the benzine." See also *Horn* v. *Buck,* 48 Md. 372, and *Franklin* v. *Long,* 7 G. & J. 407.

*Edgar H. Gans* and *Charles Markell,* for the appellees.

1. The failure of the plaintiff to deliver goods of the kind and quality called for by the contract gave the defendants the right to rescind the contract. No question of breach of warranty, express or implied, is presented in this case.

There is simply a failure on the part of the plaintiff to deliver goods of the kind and quality called for by the contract. The defendants contracted to buy "firsts." The plaintiff did not deliver "firsts," but did deliver a different commodity not called for by the contract, viz., "seconds." For the failure to deliver the goods called for by the contract the defendants rescinded the contract. *Col. Iron Works* v. *Douglas,* 84 Md. 44.

In *Josling* v. *Kingsford,* 13 C: B. N. S. 447, 32 L. J. C. P. 94 (referred to in *Benjamin on Sales,* sec. 605), there was a sale of oxalic acid. The vendor did not warrant quality, and the article delivered had been examined and approved, and a great part of it used by the purchaser when on analysis it was afterwards found to be chemically impure from adulteration with sulphate of magnesia. There were two counts in the declaration, one for breach of contract to deliver "oxalic acid;" the other for breach of warranty that the goods delivered were oxalic acid. It was held that there was no evidence of a warranty, but that it was a question for the jury whether the article delivered came under the denomination of "oxalic acid" in commercial language. A verdict for the plaintiff was sustained.

The testimony in the record leaves no question for the jury whether the goods delivered were in commercial language "plain sheetings, soft twisted yarn." The witnesses for the plaintiff and those for the defendant agree that "seconds" do not in commercial language come within the description of the goods in the contract.

The right to rescind a contract of sale of goods to be delivered in instalments, for non-delivery of one or more instalments according to the contract, though the subject of conflicting decisions elsewhere, is not now involved in doubt in Maryland, or, indeed, in the Supreme Court of the United States, and most of the Courts in this country. The decisions in England are difficult to reconcile, though, perhaps,

the later English cases recognize the right to rescind only when non-delivery or non-payment occurs under circumstances amounting to a refusal to further abide by the contract or inability to do so.

Early cases frequently discuss the question whether the contract is an entire or a divisible contract. This was discussed in the case of *Maryland Fertilizer Co.* v. *Lorentz, 44* Md. 218, though the question actually presented and decided in that case was whether there had been a waiver of the breach of contract. The later cases, in this country and in England, concur in the view that an instalment contract is an entire contract, the cases conflicting on the question whether a breach of contract as to one instalment is an entire breach, *i. e.,* a breach of the entire contract. Thus, the House of Lords in *Mersey Steel Co.* v. *Naylor,* 8 App. Cases, 434, holding that a vendor was not entitled to rescind for non-payment for one instalment, and the Supreme Court of the United States in *Norrington* v. *Wright,* 115 U. S. 188, holding that the purchaser is entitled to rescind for non-delivery of one instalment, agree that in either case the contract is an entire contract. *Norrington* v. *Wright,* is the leading case in the country. The opinion of the Court by Mr. Justice Gray reviewed at length the English cases, and some of the cases in this coutry, and stated the substance of the Court's decision in the following sentence: "The seller is bound to deliver the quantity stipulated, and has no right to compel the buyer to accept a less quantity or to require him to select part out of a greater quantity; and when the goods are to be shipped in certain proportions monthly, the seller's failure to ship the required quantity in the first month gives the buyer the same right to rescind the whole contract that he would have had if it had been agreed that all the goods should have been delivered at once." 115 *U. S.* 204-5.

It is worth noting that half of the sentence just quoted, though not the part of the sentence particularly in point in the present case, was quoted with approval by this Court in the case of *Salmon* v. *Boykin,* 66 Md. 541, 550. The Supreme Court, in *Norrington* v. *Wright,* distinguished the case of *Mersey Steel Co.* v. *Naylor,* on the ground that that case involved only non-payment for one instalment, while *Norrington* v. *Wright* involved non-delivery, which the Supreme Court considered the more essential breach of contract, giving a right to rescind, even though non-payment might not in all cases give such right.

This Court has gone much further than the Supreme Court of the United States in upholding the right to rescind for default with respect to one instalment, and has repeatedly affirmed the right to rescind for non-payment, as well as for non-delivery of one instalment. One of the first cases in this Court in which the right to rescind an instalment contract was directly involved, was *Bollman* v. *Burt,* 61 Md. 415. In that case, as there had been a failure to deliver any of four successive instalments, this Court refrained from deciding whether non-delivery of one instalment would have warranted rescission, but did decide that non-delivery of the fourth instalment, after three defaults had been waived, gave a right to the purchaser to rescind.

In each of the three subsequent cases of *McGrath* v. *Gegner,* 77 Md. 331, 336-7, *Baltimore City* v. *Schaub,* 96 Md. 534, 552-5, and *Webster* v. *Moore,* 108 Md. 572, 595, this Court affirmed the right of a vendor to rescind for non-payment of one instalment.

The cases of *Baltimore City* v. *Schaub* and *Webster* v. *Moore* go much further than it is necessary to go in this case. In *Baltimore City* v. *Schaub,* a contractor was held to be entitled to rescind a contract to sell coal to the City of Baltimore on account of non-payment for previous deliveries. As the city's ability to perform its contract was, of course,

not questioned, and its failure to pay was due to a *bona fide* dispute as to the construction of the contract with respect to times of payment, it might seem that the vendor could have been adequately compensated in damages. This Court, however, upheld his right to rescind.

In *Webster* v. *Moore*, a purchaser of canned tomatoes refused to make payment in full, claiming the right to deduct damages on account of inferior tomatoes delivered and paid for on previous instalments under the same contract. This Court held that refusal to pay the contract price, even though the purchaser's claim for damages were well founded, entitled the vendor to rescind the contract.

Since the right to rescind for non-payment for one instalment is thus established in this State, though denied by the House of Lords and not yet recognized by the Supreme Court of the United States; *a fortiori*, will the right to rescind for non-delivery, which is recognized by the Supreme Court as a less drastic right than the right to rescind for non-payment, be recognized by this Court.

The same principles apply to non-delivery or non-payment of an instalment after previous instalments have been delivered, or previous breaches have been waived, as apply to a breach of contract with respect to the first instalment. *Kakas* v. *Hollingshead,* 184 N. Y. 211, 3 L. R. A. (N. S.) 1042.

After part performance, the rights and duties of the parties as to the performance of the part which remains unperformed, are the same as if that part had been the whole contract between them. *Cleveland Rolling Mill Co.* v. *Rhodes,* 121 U. S. 255, 263, 264.

This principle is involved, if not expressly so stated, in the decisions of this Court already cited. The principles herein referred to were applied to this case by the lower Court. In fact, we do not understand that the plaintiff questions the right of the defendants to rescind the contract for breach of contract with respect to any one of the first four

shipments.   We understand that the sole contention of the
plaintiff is that this right to rescind was waived and lost by
the defendants, by reason of the disposition made of the
goods in the second, third and fourth shipments, and by
reason of other circumstances on which the plaintiff relies.

2. The defendants did not by their actions waive or lose
the right to rescind.   As the plaintiff practically basis its
case on the doctrine of waiver, it is well to point out at the
outset that the question of waiver is not, in this case, as it
frequently is, connected with any question of estoppel.   The
plaintiff comes into Court, compelled to confess that it has
repeatedly broken, in its most essential particulars, the con-
tract on which it sues, and that it thereby gave the defend-
ants the right to do just what they did do, viz., to rescind,
which right it, however, claims the defendants waived.

No one has been, and no one possibly could have been,
prejudiced by delay in exercising the right to rescind, ex-
cept the defendants themselves.   The plaintiff has not even
been prejudiced by being induced to manufacture more goods,
for, as a matter of fact, when it did receive notice of cancel-
lation, it did not stop, but continued to make goods for more
than two months longer.

The only practical consequence, aside from rules of law,
of the goods of the second, third and fourth invoices having
been put in process before the defendants discovered the char-
acter of these goods or the goods of the first shipment, was
that the defendants paid the full contract price,—over $10,-
000.00,—for "seconds," which they could not return, but
which could not be of any use to them, while the plaintiff
received $10,000 for goods which it could not otherwise have
marketed at any price.   Several weeks before November 25,
1907, when the second shipment left Augusta, the market, on
account of the panic, had not merely fallen, but there was no
market at all.   Had the defendants been seeking to evade
their obligations they might have had a special examination

made of the first shipment before the subsequent shipments went into process. That they followed the usual custom of the trade and did not do so was not due to self-interest. They were the losers, the plaintiff the gainer, thereby.

Under such circumstances the absence of hasty action only indicates consideration for the rights of the plaintiff and a desire not to assert claims prompted by self-interest but without a just basis; it certainly does not indicate an intention to relinquish rights and does not prejudice the plaintiff. There never was, in November or December, 1907, any possibility of juggling the plaintiff's rights by delay and benefiting by a turn of the market. There was no market to turn. It was always to the pecuniary interest of the defendants to rescind; if they did not exercise that right as promptly as they might have done, the plaintiff, not they, benefited thereby. The mere fact that such delay as there was, avoidable or unavoidable, cost the defendants over $10,000 and benefited the plaintiff to the same extent, does not seem a sound reason for imposing further liability on the defendants.

The plaintiff, in the lower Court, relied principally on the fact that the second, third and fourth shipments had been put in process, as evidence of a waiver of the right to rescind. It was contended that this use of the goods, rendering it impossible to return them in their original condition, amounted in law to a waiver of the right to rescind, and that this waiver resulted, irrespective of whether the defendants had knowledge of the facts which gave rise to their right to rescind, and therefore irrespective of whether they intended to waive their right.

If this contention be sound, then in the law of sales, the term waiver has not its ordinary meaning and the principle that a man cannot take advantage of his own wrong has no application.

Waiver is defined by Bouvier as "the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it."

Both knowledge and intent are essential elements of a waiver. This is as true in the law of sales as in other branches of the law. All of the many cases cited by the plaintiff below in support of the proposition that the use by a purchaser of goods bought, so that he cannot return them, amounts to a waiver of the right to rescind, were cases where such goods were used with knowledge, or the equivalent of knowledge, of the facts on which the right to rescind depended. The case of *Lyon* v. *Bertram,* 20 Howard, 149, which was cited by the plaintiff below, and was followed in a recent *Georgia case,* also cited by the plaintiff below, is a fair example of the cases relied on. The point there decided, as stated in the head note, was that "where an article is warranted and the warranty is not complied with, a purchaser who has received and paid for and used a portion of the article and derived a benefit from it, cannot then rescind the contract."

Although the Court did not dwell on the fact that the goods were used with knowledge or full means of knowledge of the breach of warranty, yet that fact did clearly appear in the opinion, and was essential to the decision of that case, as has been explained in subsequent decisions of the Supreme Court.

Thus, in *Pope* v. *Allis,* 115 U. S. 363, 373, the Court, in the course of its opinion, said: "We have been referred by the plaintiffs in error to the cases of *Thornton* v. *Wynn,* 12 Wheat. 184, and *Lyon* v. *Bertram,* 20 How. 149, to sustain the proposition that the defendant in error in this case could not rescind the contract and sue to recover back the price of the iron. But the cases are not in point. In the first, there was an absolute sale, with warranty and delivery to the vendee, of a specific chattel, namely: a race horse; in the second, the sale was of a specified and designated lot of flour, which the vendee had accepted, and part of which he had used, with ample means to ascertain whether or not it conformed to the contract."

And' in *Norrington* v. *Wright,* the same Court not only distinguished the case of *Lyon* v. *Bertram,* but stated the principles which are applicable to the case at bar: "The plaintiff, instead of shipping about 1,000 tons in February and' about 1,000 tons in March, as stipulated in the contract, shipped only 400 tons in February and 855 tons in March. His failure to fulfill the contract on his part in respect to these first two installments justified the defendants in rescinding the whole contract, provided they distinctly and seasonably asserted the right of rescission.

"The defendants, immediately after the arrival of the March shipments, and as soon as they knew that the quantities which had been shipped in February and in March were less than the contract called for, clearly and positively asserted the right to rescind, if the law entitled them to do so. Their previous acceptance of the single cargo of 400 tons shipped in February was no waiver of this right, because it took place without notice or means of knowledge, that the stipulated quantity had not been shipped in February."

The Supreme Court thus distinctly holds that the acceptance and use of one instalment of goods, without knowledge of the facts which give a right to rescind, is no waiver of the right to rescind. The Court also incidentally alludes to two subsidiary circumstances, viz., that the plaintiff suffered' no injury by the omission of the defendants to return the first shipment of iron, having been paid more than the market price for it, and that no reliance was placed on the omission to return the iron in the correspondence between the parties.

Singularly enough, all three of the reasons given by the Supreme Court for holding that there was no waiver apply to this case. The defendants had no knowledge, and' no practical means of knowledge, of the quality of the goods that were put in process, according to the universal custom of the trade, in reliance on the inspection which it was the duty of the plaintiff, not of the defendants, to make, and which it was not only impossible, but unnecessary, for the

defendants to duplicate had the plaintiff discharged its duty. The plaintiff also suffered no injury in this case, but, on the contrary, derived a benefit from the inability of the defendants to return the second, third and fourth shipments, receiving thereby over ten thousand dollars ($10,000) for goods which were defective in quality, and regardless of quality, could not at that time have been marketed at any price. Furthermore, no reliance was placed on the inability to return these goods in any of the correspondence between the defendants and the plaintiff's representatives.

It would be impossible to find a case more nearly in point, as it would be impossible to find a case of higher authority (outside of the decisions of this Court itself), than *Norrington* v. *Wright*. Other cases of high authority, not so close to the present case on the facts, nevertheless apply the same principle, that in the law of sales, as in every branch of the law, knowledge is essential to constitute a waiver. *Josling* v. *Kingsford,* 13 C. B. N. S. 447; 32 L. J. C. P. 94.

This Court has more than once applied the principle that use, or acts of ownership, while they may establish title to the thing used, do not necessarily amount to acceptance under a contract, where such use or acts of ownership are not inconsistent with non-acceptance. Applying this principle to building contracts, it is held that when of necessity a man exercises ownership over a structure erected on his land he does not thereby accept such structure as in compliance with a contract for its erection. *Pope* v. *King,* 108 Md. 37.

The rule that on rescission of a contract of sale the goods must be returned, and the right to rescind is waived by using the goods so as to make a return of them impossible, is in no sense an inflexible rule, or a qualification of the principle that knowledge is essential to a waiver. As was held by the Supreme Court of Kansas, "the rule that upon the rescission of a contract for the purchase of a chattel the parties must be placed *in statu quo* does not require in all cases that an absolute and literal restoration shall be had; but it will be

sufficient if such restoration shall be made as is reasonably possible, and such as the merits of the case demand." *Fairbanks Co.* v. *Walker,* 76 Kas. 703; 17 L. R. A. (N. S.) 558.

The rule requiring a return of the thing sold is only an application of the general principle that a man cannot occupy two inconsistent positions, or play fast and loose by repudiating a contract and at the same time retaining benefits under it. The rule is not imperative when there is no such inconsistency; as, for instance, when the purchaser is unable to return the goods, without fault on his part, or *a fortiori,* when he is unable by reason of the default of the vendor.

Thus, it was held by the Supreme Court of Alabama in the case of *Magee* v. *Billingslea,* 3 Ala. 699, 702-3 (a case cited with approval by the Supreme Court of the United States in *Pope* v. *Allis,* 115 U. S. 363, 372), that the accidental destruction of goods by fire is not a bar to rescission, if such destruction occur before a reasonable time after the discovery of defects in the goods.

In *Bunch* v. *Weil,* 72 Ark. 343, 65 L. R. A. 80, it was held that one who purchases flour in quantities by the barrel for resale may, upon discovering that the flour delivered is not in accordance with the contract, after having sold part of it, rescind by tendering back as much as is undisposed of and recover back the purchase price less what he has realized from the sales.

The decisions in this State and elsewhere in cases of sales of goods to be delivered in instalments demonstrate that the rule requiring, as a condition of rescission, a complete return of the goods sold, is not an inflexible rule, but is limited by the necessities of the case. If this were not so, the right to rescind could practically never be exercised in case of a default as to any instalment except the first, since it would be a practical impossibility to return the goods delivered on previous instalment. The established rule is, however, that the right to rescind exists in case of default on any instalment.

There is nothing in any of the cases relied on by the plaintiff below which really conflicts with the cases we have cited, or with the principles which, we submit, must govern this case. A purchaser cannot knowingly, or with full means of knowledge, use a defective article, and then, when he is unable to return it, rescind the contract of purchase. The law helps those who help themselves, and will not permit a man to shut his eyes to obvious defects and then claim to have been ignorant of them. But the law does not compel merchants to treat each other as cheats. It does not require a purchaser to assume that his vendor will break his contract or perpetrate a fraud upon him. It does not require him to depart from an universal custom of the trade and to attempt to make an inspection which is physically impossible, simply to ascertain whether the vendor has neglected his duty to make such an inspection when it was not impossible. Still less does the law impose such a burden on the purchaser as a duty to the vendor, whose fraud or neglect alone could make such second inspection useful. A new cause of action will have been discovered when a vendor may sue his vendee for breach of duty to seek out and discover the vendors's fraud—or his wilful neglect, equivalent to fraud.

The reasoning of the plaintiff with respect to the duty to return goods as a condition of rescission leads to curious results. It is not denied that the defendants were entitled to rescind the entire contract on account of any one of the four shipments of defective goods, provided the goods in such shipment were returned or tendered. It is not denied that each of the four shipments was defective and warranted a rescission. It is claimed, however, that the defendants could not rescind on account of the second, third and fourth shipments, because those goods were put into process; and that they could not rescind on account of the first shipment, which was not put into process, because that default was waived by putting the second, third and fourth shipments into process.

If, instead of putting the goods of the fourth shipment into process, the defendants had put the first shipment into process, there would have been no obstacle, according to the plaintiff's theory, in the way of rescission. There would still have been four defective shipments, each entitling the defendants to rescind. There would still have been only one out of the four shipments on hand capable of being returned on rescission, but because that shipment of goods on hand would have been numbered four, instead of one, in the order in which the goods left Augusta, the defendants would have had the right to rescind, which the plaintiff now contends they waived. In other words, the substantial rights of the parties depend upon a juggling of figures.

The law of sales is not such a trick in arithmetic. The use of a subsequent shipment amounts to a waiver of a default as to a previous shipment, not because the one is labelled "2" and the other is labelled "1," but only when and because, as in *Bollman* v. *Burt,* the use of the subsequent shipment with knowledge of the previous default is inconsistent with any intent, except an intent to waive the default. If, after the defendants had discovered the defective quality of the second, third and fourth shipments, they had made use of the goods in the first shipment, which were still on hand, such use of the first shipment would have been a waiver of the defaults as to the second, third and fourth shipments, just as fully as the use of the fourth shipment with knowledge would have been a waiver of the default as to the first shipment. The waiver depends upon knowledge, not upon any magic sequence of numbers.

The plaintiff very strenuously argued below that the defendants had waived their right to rescind by accepting, on the 21st of December, a modification of the contract so as to reduce subsequent monthly deliveries under the contract from three hundred and fifty thousand to two hundred and fifty thousand yards, besides making no deliveries in December, which had already been agreed to. It was argued that

the acceptance of this modification on the 21st of December was a recognition of the existence of the contract, which amounted to a waiver of the right to rescind.  As it is claimed that this modification was accepted on December 21st, while the contract was not formally rescinded until December 23rd, this argument is substantially only another form of the contention that the defendants were guilty of unreasonable delay in exercising their right to rescind.  Unless there was an unreasonable delay in not rescinding sooner than December 23rd, there could be no inconsistency in accepting this modification of the contract on December 21st.  Until the contract was actually rescinded, it was undoubtedly in force, and the acceptance of a modification of the contract, as the culmination of negotiations begun weeks before when there was no suspicion of grounds for rescission, was no more an affirmance of the contract than mere non-action or failure to rescind.  Of course, as has already been remarked, there is no element of estoppel involved; it is not pretended that on or after December 21st the plaintiff did take or could take any action to its prejudice as the result of an agreement to deliver two hundred and fifty thousand (250,000) yards, instead of three hundred and fifty thousand (350,000) yards in January.  If, therefore, the defendants delayed unreasonably in not rescinding before December 23rd, such delay might amount to a waiver of the right to rescind; if they did not delay unreasonably, the contract was in force until December 23rd, and the acceptance of the modification on December 21st was consistent with this fact.  The contract was at all times either in force or not in force.  There could be no middle position.

On the facts shown in the record there is no semblance of unreasonable delay on the part of the defendants in exercising their right of rescission.  It must be remembered that the contract rescinded was a contract for the sale of one million, seven hundred and fifty thousand yards—almost a

thousand miles—of goods. The defendants had to determine not only the actual condition of the one bale of goods which they had ordered down from Rhode Island, but also whether the condition of that bale was such as to warrant the inference that the other one hundred and eighty-one bales were also defective, and to justify them in rescinding a contract which covered more than twelve hundred bales. The bale was ordered immediately when the first half-yard sample was received, and did not arrive until December 17th, late in the afternoon, after Mr. Oppenheim had left for New York. Mr. Oppenheim did not return until Friday evening, December 20th; spent all day Saturday, until six o'clock, with Mr. Baldwin examining the bale of goods, and on Monday morning formally rescinded the contract. There was, therefore, not only no unreasonable delay, but no delay at all.

PEARCE, J., delivered the opinion of the Court.

This suit was brought by The Enterprise Manufacturing Company, a corporation doing business in Augusta, Georgia, against Oppenheim, Oberndorf and Company, co-partners, of the City of Baltimore, claiming one hundred thousand dollars damages for the alleged breach of a contract for the purchase by defendants from the plaintiff of one million seven hundred and fifty thousand yards of cotton goods.

The plaintiff owns and operates a cotton mill, and the goods it manufactures are known to the trade as "grey goods." There is some sale for these goods as they come from the mill unbleached, but their principal and most extensive use is for printing and dyeing to be made up into various garments. Purchasers of these goods for the latter purpose, are known in the trade as "Converters," and such purchasers ship such goods for that purpose to a "finishing mill" or "print mill," usually somewhere in New England, and when thus "finished," or "processed," the goods are shipped to the purchaser or to his customers, who make them

up into shirts or other garments. The defendants are both "converters," selling the processed goods to other persons who are their customers, and also shirt manufacturers, doing a large business both in Baltimore and New York.

Woodward, Baldwin and Company are large dry goods commission merchants in Baltimore, who sell the products of many Southern cotton mills, and had for twenty-five years represented the plaintiff in that way, and they had during that period sold large quantities of plaintiff's goods to the defendants. The contract sued on in this case was as follows:

"Date, 7/15/—7.
Sold to Oppenheim, Oberndorf & Company, Baltimore Md.,
        By   W. B. & Co.:—
Quantity, 1,750,000 yds.
Grade, Plain sheetings, soft-twisted yarns.
To count, 52x44 picks to square inch.
Weight, not lighter than 5 yards to pound.
To be 36 inches wide.
Cuts to run D. C.        yards each.
Bales to contain        yards.
Price, 5¾.
Terms, 2%, 10, 60 ex.
Delivery, 350,000 yds., monthly, equal weekly, Nov, Dec., '07,
        Jny., Feb., Mch., '08.
Freight prepaid to Blchy.
Shipping directions Later.
Accepted, seller                      . Accepted, buyer,
        S. Baldwin, Jr.                  O. O. & Co."
(Record, page 36.)

And in executing it, Woodward, Baldwin and Company acted for the plaintiff, their undisclosed principal.

The declaration contained the common counts, and a special count setting out the contract. This count alleged that defendants actually received and accepted from the plaintiff 350,195 yards of the goods manufactured for them and had

paid on account thereof $10,371.45, leaving a balance due thereon of $9,791.04. It then alleged that on December 21. 1907, the original contract was modified by providing that deliveries should not begin until January, 1908, and that the monthly deliveries should be reduced from 350,000 to 250,000; that in accordance with such modification, it manufactured the further quantity of 1,045,648 yards of said goods, and tendered the same at the proper times to the defendants, who refused to accept or pay for the same, and on December 23, 1907, notified the plaintiff that they rescinded said contract, whereupon the plaintiff discontinued the manufacture of goods under the contract though ready and willing to perform said contract, and though it had incurred large expense in preparing to do so. It then alleged there was due the plaintiff the full contract price for the goods manufactured and tendered as above stated, in addition to the balance of $9,791.04 for the goods delivered, and also a large sum for profits lost by reason of the cancellation of said contract. The defendants pleaded the general issue, and a special plea of set off, alleging a breach of the same contract by the plaintiff in the delivery of several instalments of goods, not "firsts" such as the defendants had contracted for. and not proper or merchantable goods under said contract, but which the defendants paid for assuming that they would be proper deliveries under said contract, and without having had an opportunity, in the reasonable conduct of their business, to inspect said goods or to discover the defects which were disclosed when examined, but that as soon as these defects were discovered they cancelled said contract and demanded payment of the loss sustained by reason of said improper deliveries, to the amount of $15,000. The issues were properly joined on all the pleadings, and at the close of the testimony which was voluminous, the plaintiff offered six prayers, and the defendants offered eleven. The Court rejected all the plaintiff's prayers, and also rejected the de-

fendants' tenth and eleventh prayers which were based upon their plea of counter-claim or set-off, and granted the defendant's first prayer, that under the pleadings there was no evidence legally sufficient to entitle the plaintiff to recover, and therefore their verdict must be for the defendant.

The modification of the original contract was brought about in this way. That was made in July, 1907, when the market for "grey goods" was steady and prices firm. In October, 1907, a financial panic was impending, threatening general disaster, and especially to those interested on a large scale in the manufacture and conversion of cotton goods. The defendants had at that time, numerous contracts similar to the present, many of which were made through Woodward, Baldwin & Company, who were familiar with existing market conditions. Sometime in November, Mr. Oppenheim informed Woodward, Baldwin & Company that his customers all over the country were cancelling their contracts and that it would be a great hardship for him to have to take that lot of goods according to the original deliveries, and requested them to endeavor to arrange for an extension of deliveries, or if possible for buying out the contract. They took up this matter with the plaintiff, and failing to secure the buying out of the contract, endeavored to have the monthly deliveries cut in half, but failed in this also. The plaintiff, while declining this proposition, offered "to hold back twenty per cent. of monthly deliveries until times become normal again. This is the best we can do to help buyer." This was not satisfactory to defendants, and Woodward, Baldwin & Company so wrote the plaintiff, saying: "We ourselves know that we cannot afford to crowd him, and are quite sure if you were on the spot that you would feel as we do. We are satisfied you will do everything to alleviate this position which is possible." This was on December 11th, 1907. On the 17th of December plaintiff offered to make no delivery for December and thereafter to

deliver monthly 250,000 yards until the contract was completed, and on December 21, 1907, defendants accepted this modification, and on the same day Woodward, Baldwin & Company so notified plaintiff by letter, "thanking them for the accommodation." It will be noted that the modification thus made had exclusive reference to the extension of time and reduction in quantity of monthly deliveries, and left the *character* of goods the same, though by a previous agreement, the width of the goods had been changed from 36 to 37 inches, the weight per yard remaining the same, and the price changed from 5¾ cents to 5⅞ cents per yard. The negotiations for the final modification of the contract were conducted on all sides in the broad and liberal spirit which characterises the conduct of men accustomed to deal in large transactions, and mindful of the wisdom of mutual concessions in time of financial stringency or panic.

On October 1st, 1907, before the approaching panic had been taken into account by the parties, the defendants gave shipping instructions to the plaintiff directing the first weekly instalment of goods to The Southbridge Printing Co., Mass., and the balance, until otherwise instructed, to S. H. Green & Son, Clyde, R. I.; but later, about October 12th, they were instructed to ship first instalment also to S. H. Green & Son. On November 2nd, these instructions were revoked until further notice. In the meantime, however, on October 25th, 1907, an invoice of 79,771 yards had been shipped as ordered to S. H. Green & Son. Three invoices were ready for shipment, on November 5th, 12th and 20th, respectively, but were held for shipping instructions. On November 22nd, the invoice of November 5th, 65,920 yards, was ordered shipped to the U. S. Finishing Co., Pawtucket, R. I., and arrived there about December 5th. On the 27th, the invoice of November 12th, 51,462 yards was also ordered to Providence, R. I., and was received in the print mill on December 23, 1907, and on the 27th also the invoice of November

20th, 62,756 yards, was ordered shipped to Pawtucket and was received and put into process about December 13th. Prior to December 23rd, 1907, when defendants cancelled the contract, a fifth instalment had been invoiced to defendants, but never left Augusta, for want of shipping instructions. The record of goods invoiced therefore stands thus:

"(1) Oct. 25th, 1907, 79,771 yds. $4,592.82, shipped Oct. 25th to S. H. Green & Son.

(2) Nov. 5th, 1907, 65,920 yds. $3,795.34, shipped Nov. 25th to U. S. Finishing Co.

(3) Nov. 12th, 1907, 51,462 yds. $2,962.92, shipped Nov. 30th to U. S. Finishing Co.

(4) Nov. 20th, 1907, 62,756 yds. $3,613.18, shipped Nov. 30th to U. S. Finishing Co.

(5) Nov. 30th, 1907, 90,286 yds. $5,198.22, never left Augusta."

The second, third and fourth instalments were converted and have been paid for. The first was never converted and was held subject to plaintiff's disposal, and the fifth remaining at Augusta was embraced in the cancellation.

There was never any complaint as to the grade of the goods, viz.: "Plain sheetings, soft-twisted yarns"—none as to the number of strands to the square inch either in the warps or in the filling—none as to the width of the sheeting, nor as to the number of yards to the pound—none as to the making up in double cuts. It is conceded that the contract in question called for what are known as "firsts" in the trade, "seconds" never being deliverable unless specified in the contract. They not only sell for less than "firsts" but they are unfit for converting and for making shirts, and are never used for that purpose.

But in weaving such goods as those in question various imperfections sometimes occur. These imperfections are variously described in the testimony as "run threads," or

"drop threads," "thick and thin places," "misweaves," "knotted filling," "scratch ups," "holes" and "oil stains." A drop thread is a broken thread not caught up, and leaving a vacancy in the cloth. "Thick and thin places" speak for themselves, places where the uniformity of the body of the cloth is not preserved and the goods are humpy and uneven. These may all be classed as misweaves generally. "Knotted filling" leaves kinks in the cloth. "Scratch ups" is one of the most serious defects and is described by Mr. Verdery, the plaintiff's president, to be "a break of several threads and the weaver tries to pull them together again with a little comb." He said that was one of the most serious defects when the goods go to the bleachery for printing; that two or three such "scratch ups" in a piece of 50 or 60 yards would justify throwing it out as "seconds;" and that this was true also of misweaves, loose threads, thick and thin places, and oil stains.

Otis G. Lynch, a former superintendent of the plaintiff testified that "scratch ups" ought not to be found in "firsts," and if found in any quantities the goods were "seconds;" that there was no fixed percentage of defects which would render goods "seconds," and that "the mills were not expected to put up any bad goods."

For the protection both of the manufacturer and the purchaser, and especially where the goods are for conversion, a careful system of inspection for defects in these grey goods is necessary at the mills when and as they are made, and according to all the testimony, when the goods are to go to a converter from the manufacturer, this is the only inspection practicable; the converter never makes an inspection before processing the goods, unless specially ordered by the purchaser, or unless upon opening the bales, defects are discovered so numerous and serious as to require notice to be given to the purchaser. The mills provide inspectors for that purpose. When the goods come from the looms, they go

to the brusher, and from him to the measurer, and they are made into cuts, single or double as may be required. The bolts are then placed on a table, opened and turned over, examined yard by yard, separating them into "firsts," and "seconds;" the "firsts" going all into one pile, and the "seconds" all into another pile. If they are to be branded they then go to the branding room; if not, they are put up at once. They are then weighed on the scales, and are folded by a machine in the same room, and are numbered. "Firsts" and "seconds" cannot be intermingled unless the inspector has been negligent in his duty. If the mill is able to make first class goods, all depends upon the accuracy of the inspector. The defects in grey goods are magnified in processing, and depreciate the value of the finished goods very greatly. When grey goods are shipped by purchasers to the print mills they are stored in bales just as they arrive until they are ordered into process, whether for a month, or a year, or two years.

The first invoice reached the print mills about November 11th, 1907, but were never ordered into process. Two of the bales in that invoice were subsequently sent to Baltimore for examination, after the cancellation, as were 103 pieces out of other bales but the rest of this invoice remains at the print mill subject to the plaintiff's order. The second invoice arrived at the print mill about December 5th, 1907, had already been ordered into process, and were put in process soon after their arrival. The third and fourth invoices were shipped from Augusta about November 30th, 1907. Both had been ordered into process, and were put in process soon after their arrival. The fourth was received about December 13th, 1907, and the third on December 23, 1907, or possibly a day or two earlier but were put in process on the 23rd, inst. The fifth invoice, as heretofore noted, never left Augusta, and remains subject to plaintiff's order.

On December 23rd, defendants cancelled the contract for the defects alleged to have been just discovered in the goods,

and on that day called up the print mills and learned the goods in the second, third and fourth invoices had all gone into process.

It would serve no useful purpose to go in detail into the evidence as to the existence of the alleged defects in the goods delivered under the contract. The integrity of none of the witnesses is fairly open to questioin, and their testimony throughout is characterized by caution and frankness.

Such witnesses for the plaintiff as Mr. Verdery, Mr. Lynch, Mr. Donohue, Mr. Gerald, Mr. Fish and others, all acknowledged experts, and most of them disinterested, testified that they inspected large quantities of the goods manufactured for defendants, *but not delivered,* and found them all to be "Firsts." But it was from the *goods alone that were actually delivered* that the defendants could judge of their course in regard to cancelling the contract, and it is from the evidence as to those goods alone that we must reach our conclusion upon that question.

During the course of the trial, large quantities of the grey goods unprocessed, from the first shipment, and also from five bales of the third shipment which were inadvertently omitted when the rest of that shipment was put in process, as well as large quantities of finished goods from the second and fourth shipments were examined by both plaintiff's and defendants' witnesses. Elaborate tabulations were made by defendants' expert witnesses of the various defects found in these goods showing the average number of specific defects to each piece examined, misweaves ranging as high as 45 in 129 pieces, thick fillings as high as 30, thick and thin places as high as 22, knotted fillings as high as 6, holes as high as 3. In another lot of grey goods "scratch ups" ranged from 7 to 1 per piece. These will suffice as illustrations, and it was admitted by Mr. Verdery, the plaintiff's president, and testified by Mr. Summerfield Baldwin, Jr., one of plaintiff's witnesses, that none of the four shipments thus examined complied with the contract.

Upon this state of facts two questions arise:

(1) Did the failure of the plaintiff to deliver "Firsts" as required by the contract give the defendants the right to rescind the entire contract; and,

(2) If such right of rescission resulted from the plaintiff's breach of contract in the delivery of the four instalments actually made, was the right of rescission lost by reason of the use made of the goods by the defendants in the second, third and fourth shipments, or by any other act on their part?

The first of these questions must be regarded as settled in this State. The sale in this case was of a certain described article, "Plain Sheetings—Soft-twisted yarns;" an article known in the trade as "Firsts;" a different article from that known in the trade as "Seconds," and known by the vendor to be designed for a use to which "Seconds" cannot be put.

In *Columbian Iron Works* v. *Douglas,* 84 Md. 64, CHIEF JUDGE McSHERRY said: "If the sale is of a described article, the tender of an article answering the description is a condition precedent to the purchaser's liability, and if this condition be not performed, the purchaser is entitled to reject the article. * * * It can make no possible difference whether the failure of the plaintiff to secure what he contracted for, grew out of the fraud of the defendant, or out of an accident unmixed with bad faith."

In *Pope* v. *Allis,* 115 U. S. 363, the Supreme Court said: "When the subject matter of the sale is not in existence, or not ascertained at the time of the contract, an undertaking that it shall, when existing, or ascertained, possess certain qualities, is not a *mere warranty,* but a *condition,* the performance of which is precedent to any obligation upon the vendee under the contract; because, the existence of these qualities, being part of the description of the things sold, becomes essential to its identity, and the vendee cannot be obliged to receive and pay for a thing different from that for which he contracted."

In *Norrington* v. *Wright,* 115 U. S. 188, recognized as a leading case in this country, the Supreme Court held that in a contract for the sale and purchase of 5,000 tons of·iron rails, with subsidiary provisions for shipments in different months, and for payment upon each delivery, the seller's failure to ship the required quantity the first month, gives the buyer the same right to rescind the whole contract that he would have had if it had been agreed all the goods should have been delivered at once, and that case has been approved and followed in *Salmon* v. *Boykin,* 66th Md. 550, and in later cases in this Court.

The principle involved in *Norrington* v. *Wright, supra,* has been recognized and applied in *McGrath* v. *Gegner,* 77 Md. 331, *Balto. City* v. *Schaub,* 96 Md. 534, and *Webster* v. *Moore,* 108 Md. 595. In each of these cases it was held that under contracts providing for monthly deliveries and monthly payments, a vendor could rescind the contract for non-payment for any one instalment or delivery. In the last case the buyer had paid for the first two instalments, but refused to pay for the third instalment, alleging that goods inferior to those described in the contract had been delivered in all three shipments, and it was held that the seller had a right, on such refusal to pay, to rescind the contract as to future deliveries.

It is quite clear upon principle that there can be no valid distinction between the exercise of the right of rescission by the vendor for the failure of the vendee to pay for an instalment delivered, and the exercise of the same right by the vendee upon failure of the vendor to deliver an instalment of goods conforming to the article described in the contract. Mutuality is an essential ingredient of the law of contract, unless expressly excluded, and if this right is more valuable in one than in the other of the two above supposed instances, it is in the latter rather than in the former.

This doctrine is applicable to failure in delivery of, or payment for, any instalment under the contract, whether the

first, or any later one, the rights of the parties being the same as to any unperformed part of the contract, as if that part had been the whole contract. *Cleveland Rolling Mills* v. *Rhodes,* 121 U. S. 264; *Pakas* v. *Hollingshead,* 184 N. Y., 24; 3 L. R. A., N. S., 1042.

The right of rescission sought to be exercised by the defendants was an incident of the contract under the facts in this case.

(2) Did the defendants lose this right by any act or conduct of theirs, either by the use of the goods delivered under the second, third and fourth shipments, or otherwise?

It has not been lost unless it has been waived intentionally, for in this case we have discovered no element of estoppel which would produce the same result as waiver. The contract required the plaintiff to pay the freight to the print mills. The goods in the first shipment which went to the mills, but were never processed, have always, since rescission, been subject to plaintiff's order, while those in the fifth invoice, which never left Augusta, have always been in their control and possession. The second, third and fourth shipments, which were put in process, have been paid for at the full contract price as "firsts," when they were in fact "seconds," and the plaintiff had been benefited instead of injured thereby. It was not induced to continue manufacturing goods under the contract, to its detriment, and did so at its own risk after notice of cancellation. It cannot be contended, as in *Delamater* v. *Chappell,* 48 Md. 253, that the use of the goods in the second, third and fourth shipments was an acceptance, indicating a waiver of the right to rescind. The circumstances of the two cases are radically different and forbid such an inference. The evidence in the case is conclusive that the only inspection made in such cases is that made by the plaintiff at its mill, and that the defendants had the right to rely upon that inspection until they were made acquainted by the print mill, as the result of pro-

cessing the goods, with the defects of which they had neither previous knowledge nor means of knowledge.

In 29 *A. & E. Enc. L.* 1091 waiver is defined as follows: "A waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right. A waiver, strictly so called, is the result of an intentional relinquishment of a known right."

In *Norrington* v. *Wright, supra,* the plaintiff instead of shipping 1,000 tons in February, and 1,000 tons in March, as stipulated in the contract, shipped 400 tons in February and 855 in March. "The defendants, immediately after the arrival of the March shipments, and as soon as they knew that the quantities shipped in February and March were less than the contract called for, clearly and positively asserted the right to rescind, if the law entitled them to do so. Their previous acceptance of the single cargo of 400 tons shipped in February was no waiver of this right, because it took place without knowledge, or means of knowledge that the stipulated quantity had not been shipped in February. The price paid by them for that cargo being above the market value, the plaintiff suffered no injury by the omission of the defendants to return the iron; and no reliance was placed on that omission in the correspondence between the parties."

In *Pope* v. *King,* 108 Md. 46, JUDGE BRISCOE called attention to the fact that the use of a building erected under a contract on the owner's land under circumstances which negative the intention of the owner to accept the work, does not constitute an acceptance of the work; and the analogy between that case and the present is too obvious to require explanation. Acquisition of title to the thing used, does not necessarily imply acceptance under a contract, of work performed on the thing used, where the use is not inconsistent with non-acceptance.

No good could be accomplished by consuming time in minute examination of the evidence as to prompt action on the part of the defendants after discovery of the alleged defects.

Under all the circumstances of this case, we are of opinion that the defendants acted with reasonable promptitude after discovering the defects, and that such abstention as appears from immediate action, is properly attributable to a due regard for the rights of the plaintiff, and a purpose to be as fully as possible correctly informed, before actual cancellation of the contract.

Finding no error in the rulings of the learned Court below the judgment will be affirmed.

> *Judgment affirmed with costs to the appellees above and below.*