D. PHILIP SCHINDEL, Administrator, *v.* CHARLES M. DANZER et al.

D. PHILIP SCHINDEL, Administrator, *v.* CLARENCE M. STICKELL et al.

D. PHILIP SCHINDEL, Administrator, *v.* WILLIAM A. DANZER et al.

[Nos. 23-26, October Term, 1931.]

*Decided December 4th, 1931.*

The causes were argued before Pattison, Urner, Adkins, Offutt, and Parke, JJ.

*Ellsworth R. Roulette,* for the appellant.

*Daniel W. Doub* and *Joseph D. Mish,* with whom were *Brindle & Brindle* on the brief, for the appellees.

Offutt, J., delivered the opinion of the Court.

The record in these cases submits appeals from decrees entered in each of four cases by the Circuit Court for Washington County, which differ from each other in the personnel

of the parties, but which all arise from transactions which are to some extent interrelated, and which are controlled by the same legal principles. For that reason it is more satisfactory to deal with them together at the same time, indicating the differences between them.

They all grow out of the financial difficulties of the White Lake Lumber Company, a corporation, and the Garland Hardwood Corporation. All the parties to the several suits, or persons whom they represent, were stockholders in the White Lake Lumber Company, which was organized in 1918 to carry on a general lumber manufacturing business, and which owned timberlands, mills, and equipment in Sampson and Bladen Counties in North Carolina. Its property was mortgaged to secure a bond issue of $250,000 under a first mortgage, and another bond issue of $250,000 under a second mortgage. In 1927 the trustee named in the second mortgage sold all the property covered by that mortgage to the Garland Hardwood Corporation, which had been formed to acquire it, and the plaintiffs and defendants in these cases, who had been stockholders in the White Lake Lumber Company, became stockholders in the Garland Hardwood Corporation.

Early in 1928 it appeared that the indebtedness of those two corporations approximated $210,000, evidenced by commercial paper held by individuals and banks, who about that time began to press for the payment of their claims. The parties to these cases, who were all stockholders in those two corporations, were all obligated either as makers or indorsers on the bills and notes of one or the other of those corporations, representing that indebtedness in varying amounts, ranging from $2,000 to over $200,000. By May of that year the insolvency of both corporations had become an established fact, and it was also apparent that their stockholders, who had loaned their credit to them either as makers or indorsers on their bills and notes, would be called upon to pay them. In some cases the persons who are parties to these cases had signed the notes as makers, and in others as indorsers, but in all cases, as between them and the two corporations, they were sureties, and for convenience will be

referred to as "indorsers". Nearly all of them appear to have been residents of Washington County, most of them identified with the business and professional life of Hagerstown, and they varied widely in financial rating and responsibility. And when it became evident that the "indorsers" would be required to pay debts of the corporations, amounting to over $200,000, on which they were personally liable, it was also apparent that the liability of each solvent indorser was likely to be increased by the fact that a number of his co-indorsers were insolvent.

The situation also became a matter of immediate concern to the banks, who feared, and with some reason, that the resources of the "indorsers" would not be sufficient to meet the demands which the collapse of the two corporations made upon them. In that emergency it was felt by both creditors and indorsers that prompt measures must be taken to avoid consequences which would be injurious both to the indorsers and the creditor banks, if it became necessary to enforce the claims by litigation. Accordingly in May, 1928, representatives of some of the interested banks and a number of the indorsers met to consider plans for settling the claims against the indorsers in such a manner as to inflict the least possible loss or injury either upon them or their creditors.

As a result of that meeting a committee, composed of Major William P. Lane, Jr., Frank W. Mish, and Victor M. Cushwa, who will be hereafter referred to as the "committee," was named to devise some plan whereby the claims against the indorsers could be paid or settled without litigation. That committee, after communicating with the creditor banks, called a second meeting at which many of the indorsers were present and all but two or three of the banks represented. At that meeting the committee outlined a plan under which they were to endeavor, on the one hand to induce each indorser to subscribe as much to a general fund to be applied to the settlement of all the claims as the committee felt could be gotten without litigation, and on the other hand to induce the banks to settle their claims for less than their face value. They then called the indorsers singly and dis-

cussed with each the amount which he was willing or able to give to be relieved from liability arising from the bills and notes of the lumber company which he had indorsed. As a result of that procedure, the committee raised a fund of $126,000 on paper, and they again approached the creditor banks, but were unable to secure their assent to any scheme of settlement which could be effected by that amount of money. They then called a third meeting, at which the indorsers raised their aggregate pledges to $145,000, and with the assurance afforded by those increased subscriptions they returned to the creditor banks, and were able to secure concessions from a sufficient number of them to enable the committee to satisfy and settle all claims against the indorsers arising out of their obligations as makers or indorsers of the commercial paper of the two lumber companies.

Among the indorsers were Aaron M. Horst, Dr. David P. Schindel, and Charles F. Strole. They with others were joint makers with the White Lake Lumber Company of a note for $13,500 payable to the lumber company, discounted for it by the Lancaster Trust Company. Strole and Schindel, with others, were also joint makers with the lumber company of a note for $15,000, discounted for it by the Nicodemus National Bank of Hagerstown, and indorsers on a note for $5,000 discounted for the White Lake Lumber Company by the First National Bank of Waynesboro, and Schindel was an endorser on a note of the Garland Hardware Company for $19,000, discounted for it by the Maryland Surety & Trust Company. Among the banks which failed to agree to accept anything less than the face value of the notes held by them against the parties to these cases were the Lancaster Trust Company, the Nicodemus National Bank, the First National Bank of Waynesboro, and the Maryland Surety & Trust Company, and the plan proposed by the committee contemplated paying their claims in full out of the fund, if they could not be settled on more lenient terms. But Dr. Schindel, who was liable either as maker or indorser on each of the four notes described above, was unwilling to await the settlement which the committee was attempting to make, and

although he had assented to the plan proposed by the committee, he undertook to have those four notes paid, and was able, through contributions by himself and certain of the makers or indorsers of these notes, to pay them in full. In accomplishing that result it became necessary for him to advance a sum greater than the *pro rata* contribution of each solvent surety would have been, if all had contributed ratably to the payment. And these several suits were brought against indorsers on those notes, who failed to contribute to their payment, to compel them to contribute such amounts as will equalize the amounts paid by each solvent indorser.

The bill of complaint in No. 23, on the docket of the October Term of this court, was filed by Horst, Schindel and Strole against William A. Danzer, Robert M. Rupp, Thomas L. Rickard, W. W. Schildknecht, Charles M. Danzer, Frank G. Wagaman, Clarence M. Stickell, Roy Danzer, Maryland Surety & Trust Company, Hagerstown Bank & Trust Company, administrator *c. t. a.* of Albert Danzer, deceased, Albert Heard, the White Lake Lumber Company, Inc., a corporation, D. A. Stickell. In it the complainants charged that the note discounted by the Lancaster Trust Company had been paid the following contributions from sureties thereon; D. A. Stickell, $1,937.50; A. M. Horst, $2,000; David P. Schindel and C. F. Strole, $1,500 each, and Clarence M. Stickell, Roy Danzer, Albert Danzer, Charles M. Danzer, Frank G. Wagaman and Albert Heard, $1,000 each; that Startzman, a surety on the note, was dead and his estate insolvent; that Rupp and Schildknecht, other indorsers, were insolvent, and that William A. Danzer and Thomas L Rickard, although solvent, had not contributed at all to the payment of the note.

In No. 24 on the same docket the suit was brought by Strole and Schindel to enforce contribution from their co-sureties on the note for $15,000 held by the Nicodemus National Bank, which was signed by them and William A. Danzer, Clarence M. Stickell, Chas. M. Danzer, Thos. L. Rickard, Roy Danzer, Albert Danzer, Robert M. Rupp, Albert Heard, A. R. Warner, A. V. Polack, J. Wm. Middlekauff, W. W.

Schildknecht, Frank G. Wagaman, Omer T. Kaylor, and which was paid by contributions from certain of the sureties as follows: C. F. Strole, $1,134.78; Albert Heard, $1,296.38; O. T. Kaylor, $1,134.77; Albert Danzer, $1,134.77; J. Wm. Middlekauff, $1,134.77; A. R. Warner, $2,000; D. P. Schindel, $2,107.43. The bill in it alleged the insolvency of certain sureties, and that others, the real defendants in the case, Charles M. Danzer, William A. Danzer and Frank G. Wagaman, although solvent, had not contributed to the payment of the note.

No. 25 on the same docket was brought by the same plaintiffs to enforce contribution from their cosureties on the note for $5,000 to the First National Bank of Waynesboro. The balance due on that note was paid by contributions from certain sureties as follows: Albert Heard, $249.83; Roy Danzer, $249.83; Albert Danzer, $249.83; J. William Middlekauff, $321.20; Frank G. Wagaman, $312.20; Chas. F. Strole, $373.51; David P. Schindel, $492—totaling $2,248.40. But William A. Danzer and Charles M. Danzer, who were also sureties on the note, refused to contribute to the payment.

No. 26 on the same docket was the suit of David P. Schindel alone, brought to force his cosureties on the note for $19,000 to the Maryland Surety & Trust Company to contribute to the payment of the balance due thereon. The complainant in his bill alleged that, while certain cosureties had contributed to that payment the amounts set opposite their names as follows: Roy Danzer, $3,368; Albert Danzer, $2,768; J. Wm. Middlekauff, $3,283; Albert Heard, $2,768; David P. Schindel, $7,293; William A. Danzer and Frank G. Wagaman, other solvent sureties, had refused to contribute to such payment.

Answers were filed in each of those cases, in which the sureties called upon to contribute set up as a defense that all of the complainants in the four cases were parties to an agreement or plan whereby a committee of three persons was authorized to settle and satisfy not only these but all other notes of the White Lake Lumber Company, or the Garland

Hardwood Company, on which the parties to the agreement, were liable, in consideration of the payment by each person who was a party to such agreement of a fixed and definite sum to a fund to be used for such settlement; that under the agreement no party to the plan was to be called upon for any contribution greater than the sum so fixed, and that the fund thus realized was sufficient to have paid the four notes to which reference has been made; that, had it not been for the action of the complainants, those notes would have been paid without further contribution by any party to the agreement; that the complainants paid the four notes in issue in those cases voluntarily; and that therefore they are not entitled to receive from the other parties to the agreement any contribution in excess of the sum which they respectively agreed to pay to the committee, and which in fact they did pay. The four cases were heard together upon the pleadings and testimony, and at the conclusion of the hearing the chancellor entered a decree in each case dismissing the bill filed therein. From each of those decrees Dr. Schindel appealed, but pending the appeal he died, and D. Philip Schindel represents him in these four cases as the administrator of his estate.

An examination of the evidence leaves no substantial doubt that David P. Schindel was a party to the agreement under which the committee was authorized to negotiate the settlement of the notes of the White Lake Lumber Company and the Garland Hardwood Company, which he and the other parties to these proceedings had signed. He himself admitted that at the second meeting of the indorsers he signed the following paper:

"Whereas I am now an endorser of certain notes of the White Lake Lumber Company and the Garland Hardwood Corporation, and am desirous of being relieved of the obligation of said endorsements.

"In consideration of being relieved of the obligation of said endorsement I do hereby agree to contribute the sum of Five thousand and 00/100—toward the liquidation of said indebtedness *of said indebtedness,* the manner of said liquidation to be determined by V. M. Cushwa, F. W. Mish and William P. Lane, Jr., said

indebtedness being set forth upon a list now in their hands.

"In the event that said individuals are unable to have me so relieved, this obligation is void and shall be returned to me.

"David P. Schindel."

That agreement was, it is true, superseded by another in which the amount payable by each of the indorsers was increased, but Dr. Schindel was a party to both agreements. Major Lane, Frank W. Mish and Victor M. Cushwa all testified that he was present at the meeting at which the final agreement was made, and that at that meeting he increased his subscription from $5,000 to $8,000. And Cushwa further testified that, as each indorser named the amount he would subscribe, he (Cushwa) wrote the name and the amount on a list, and that Schindel named the amount he would subscribe, and that he (Cushwa) wrote Schindel's name and that amount on that list, which was filed as an exhibit in the cases. The testimony of those three witnesses was corroborated by that of Edwin J. Snead, called by the appellant in rebuttal, who said that Dr. Schindel was present at the meeting at which the amounts subscribed by the several indorsers were increased, and that the increased assessment was presented to Dr. Schindel, and the witness added: "I am not clear in my mind as to whether he agreed to that or did not, there may have been some other figure, it rather runs to the inclination that Mr. Schindel agreed to some other figure." Dr. Schindel himself denied that he was a party to the agreement, but he was not corroborated, and, in view of the evidence referred to above, it must be assumed that Dr. Schindel did agree to the increased assessment, and that he was a party to the plan to satisfy the claims against the two lumber companies, on which the indorsers were liable, for an amount no greater than the aggregate of their increased subscriptions.

At the time that second agreement was made, it must have been apparent to all the indorsers that, unless some compromise or settlement were effected, it would be impossible

to anticipate with any certainty the extent of the several liabilities of each of the indorsers. The appellant alleges in one or another of the several bills of complaint that eight of the indorsers were insolvent, and of the solvent indorsers some were liable to the creditor banks for over $200,000. Dr. Schindel himself was liable on notes of the lumber companies which he had indorsed to the amount of $43,935, and the very fact that he agreed to contribute more than his proportionate share of that indebtedness to be relieved of any further liability therefor indicated that he apprehended that the insolvency of so many indorsers placed a burden on those who remained solvent that they might not be able to carry.

Nevertheless, after that agreement had been made, Schindel, acting independently of the committee, undertook to secure contributions from solvent co-indorsers on the four notes described above on which he was personally liable, which, with an amount which he was willing to subscribe, would be sufficient to pay them, and as a result of his efforts those notes were paid. As a result of that course he was required to pay a sum in excess of his subscription to the general fund, and also in excess of what he would have been required to pay had each of the solvent indorsers on those four notes paid his proportionate share of the amount necessary to pay them. The purpose of these suits is to recover from his co-indorsers on these several notes who refused to contribute at all, or failed to contribute a sufficient amount, the difference between what he actually paid and what he would have paid had the solvent indorsers on each of the four notes contributed equally to the respective amounts needed to pay them.

Two of these notes were held by banks located in Pennsylvania, and it apparently never was in the minds of the committee that they would be able to settle those notes for less than their face value. The other two, however, were held by banks in Hagerstown, the Nicodemus National Bank and the Maryland Surety & Trust Company, and those notes the committee hoped to settle for something less than their face value. Before the notes were actually paid, Schindel

informed the committee that the notes held by the Lancaster Trust Company and the First National Bank of Waynesboro must be paid, and that he would try to induce the other indorsers on these notes to contribute to their payment. The committee authorized him to proceed with that plan as to those two banks, upon the understanding that any money paid by the indorsers for the retirement of those two notes would be credited on the amounts they had subscribed to the general fund. In confirmation of that authority the committee addressed the following letter to Dr. Schindel:

> "Understanding the necessity of satisfying the obligations of the White Lake Lumber Co., and the Garland Hardwood Corporation now held by the Lancaster Trust Co., Nicodemus National Bank and the First National Bank and Trust Co. of Waynesboro, the plan of contribution by endorsers to immediately satisfy these obligations has the approval of the undersigned committee.

> "It is understood by the Committee that contributions thus made will be credited upon the amounts promised or pledged through the committee."

It will be noted that in that letter Dr. Schindel was also authorized to pay the note held by the Nicodemus National Bank. Major Lane said that was done inadvertently, and that as soon as he learned of the mistake he told Dr. Schindel that it was not "intended to include the Nicodemus National Bank in that letter." Whether that notice was before or after the note held by that bank had been paid is immaterial, because Dr. Schindel himself, when asked, "Did the Committee authorize you to pay the Nicodemus National Bank?" answered: "No, I don't think I had any real authority to pay it." The evidence as to whether he was authorized to pay the note held by the Maryland Surety & Trust Company is conflicting, but the fact that in paying it Dr. Schindel acted against the wishes of the committee was sufficiently established.

The ultimate question in the case is whether the rule that a surety, who pays more than his proportionate share of the

common obligation, is entitled to contribution from his co-sureties in such an amount as will reimburse him for the difference between his proportionate share of the debt and what he actually paid (50 *C. J.* 285), is applicable to these facts. It may be assumed that, if the settlement of the four notes involved in these appeals had been independent trans-actions, that rule would apply, but they were not. On the contrary, these notes were but a part of a much larger indebt-edness, and the obligation of the appellant under them was necessarily affected by the effect of the whole indebtedness upon those who were cosureties with him upon those notes. In order to reduce the risk incident to that situation, he entered into an agreement with all of his cosureties, some of whom were also liable for the entire indebtedness, whereby by fixed and stated contributions all of the indorsers would be relieved of all liability, not only under those four notes, but under all notes of the two lumber companies. If, after having made that agreement, for his own purpose, he elected to go beyond it, and, in order to settle the notes on which he was personally liable, he paid more than he would have been required to pay under the agreement, or more than he would have been required to pay if there had been no agree-ment, he cannot now, after the other parties to the agreement have fully complied with its terms, and after the whole in-debtedness of the lumber companies on which the indorsers were liable has been settled, demand from them more than he agreed they should pay. Nor is it necessary to that conclu-sion that the agreement should have been a contract enforce-able at law. It is sufficient if, with full knowledge of all material facts, Dr. Schindel, in order to secure the possible benefit which he felt would accrue from it, entered into an agreement with his co-indorsers under which, in effect, they waived any potential rights of contribution *inter sese* which they had in consideration of the payment by each party to the agreement of a fixed sum to a common fund to be applied to the satisfaction of the common debt, which sum was pro-portioned, not according to the legal liability of each sub-scriber, but according to his ability to pay. It is true that

the four notes in issue in this case were the only notes on which Dr. Schindel was a surety, and that they were paid through contributions of the several groups who had respectively indorsed them; but it does not necessarily follow from that, that he would have been able to secure the contributions to pay them but for the assurance which the plan gave to his co-indorsers on them that the entire liability of each on notes of the two lumber companies would be satisfied by the payment of the sum which each had agreed to contribute to that end. For if it had become necessary for the creditors to resort to litigation to enforce their claims, in view of the extent of the total liability of the indorsers it was at least possible that some of those who contributed to the payment of the four notes would have been forced into insolvency, thus decreasing the number and increasing the liability of the solvent debtors. Then, too, it was known that in several instances the amounts subscribed to the plan would be raised, not only from the resources of the subscribers, but also through the assistance of friends and relatives, thus lending to the plan resources which would not have been available either to the subscribers or to the creditors, had the creditors been compelled to resort to legal proceedings to enforce their rights. Further, it is manifest from the evidence that a number of those who contributed to the payment of the four notes did so upon the assurance that their contributions would be credited on the amounts which they had respectively subscribed to the general fund. And when Dr. Schindel, with knowledge of those facts, agreed with the indorsers who were liable in varying amounts as cosureties on the notes of the two lumber companies, that each would be wholly relieved of that liability by the payment of a fixed and stated sum, he necessarily waived any right he may have had to exact con tribution from them.

"Waiver," it has been said, "is the voluntary abandonment or surrender, by a capable person, of a right known by him to exist with the intent that such right shall be surrendered and such person forever deprived of its benefit." *Bowers, Law of Waiver,* p. 9. Its elements are "an existing right,

benefit or advantage, a knowledge, actual or constructive, of its existence, and an intention to relinquish it" (27 *R. C. L.* 908), and to be "operative must be supported by an agreement founded on a valuable consideration, or the act relied on as a waiver must be such as to estop a party from insisting on performance of the contract." *Ibid.* The doctrine extends to all rights and privileges of whatever character to which one may be legally entitled, which rest in the person against whom the waiver is alleged. *Ibid.* With estoppel, with which it is allied, it rests upon equitable principles, but while the elements of estoppel nearly always appear in waiver, and often in the application of the doctrine of waiver the terms "waiver" and "estoppel" are used interchangeably, yet "when the term waiver is so used, however, the elements of an estoppel almost invariably appear, and it is quite apparent that it is employed to designate, not a pure waiver, but one which has come into an existence of effectiveness through the application of the principles underlying estoppels". 27 *R. C. L.* 905. The distinction between waiver and estoppel is illustrated by reference to specific differences in the elements of the two doctrines in the article on "Waiver" in 40 *Cyc.,* sec. 256. It has been stated that an essential element of waiver is that there must have been a valuable consideration. Whether that is so or not, it is apparent, from an examination of cases in which the question has been considered, that by the weight of authority the consideration need not be such as is implied from the use of the term in the law of contracts, for, as said in 40 *Cyc.,* p. 263: "The confusion among the cases as to the necessity for a consideration for waiver arises out of the element of estoppel which frequently appears in the particular case. In the absence of conduct creating an estoppel, a waiver should be supported by an agreement founded upon a valuable consideration, although a consideration, such as is necessary to support a contract, is not always essential." And in general it may be said that acts or conduct resulting in prejudice to the party asserting the waiver, or benefit to the party against whom it is asserted, will be accepted as a sufficient consid-

.eration (*Ibid.; L. R. A.* 1915B, 58; *Bowers on Law of Waiver,* sec. 5), especially where it would be inequitable for the person against whom the waiver is asserted to change his position. In this case, and within those limits, the mutual promises of the several parties constituted a sufficient consideration to support the agreement upon which the waiver is founded. And since Dr. Schindel elected to accept the real or supposed benefits of the agreement instead of standing on his right to contribution from his co-indorsers, he cannot, because he voluntarily chose to pay for more complete security than he felt the agreement afforded, now, after it has been fully performed, be permitted to repudiate it and stand on his original rights, when that course would impose upon other parties to the agreement a greater burden than he agreed they should bear. It follows that the decree appealed from must be affirmed.

*Decree affirmed, with costs.*