David M. NICHOLS, and Olive J. Nichols, Aurora Federal Savings & Loan Association, a corporation duly incorporated under the laws of the United States of America, Pennick Corporation, a Maryland corporation

v.

CITIES SERVICE OIL COMPANY, a Pennsylvania Corporation.

Civ. 9746.

United States District Court
D. Maryland.

March 9, 1959.

George E. Brown, Jr., Baltimore, Md., for plaintiffs.

Howard H. Conaway, and Eli Frank, Jr. (Frank, Bernstein, Gutberlet & Conaway), Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

This is an action by David M. Nichols, Olive J. Nichols, his wife, and Pennick Corporation, plaintiffs, against Cities Service Oil Company (Cities Service), defendant, in which plaintiffs as landlord, seek specific performance of a "lease agreement", and other relief. The Nichols entered into an agreement with defendant dated June 28, 1956, the rider to paragraph 2 of which reads as follows:

> "This lease shall be for the term of Twenty (20) years commencing at such time as the Tenant shall in writing evidence the completion to its approval (which approval

shall not be unreasonably withheld) of the improvements described in the plans, specifications, and plot plan which have been examined, approved and initialled by the parties hereto; which improvements are agreed to be made by the Landlord at his own cost and expense. In the event Landlord shall fail within ten (10) months from the date of this lease, to complete to the Tenant's satisfaction the improvements herein required to be made by the Landlord, then, unless the Tenant shall elect, by written notice to the Landlord within two (2) months after the elapse of such time, to effect and complete said improvements, this lease shall be deemed cancelled and of no effect. If the Tenant shall so elect to complete said improvements, it shall be entitled to recover from the Landlord the amount expended therefor, which said amount shall be due and payable upon proof by the Tenant of the payment of all claims and charges connected with the improvements effected by the Tenant; or else Tenant may elect to credit said amount against rent thereafter to become due. Until paid, said amount shall constitute a lien on said premises in favor of the Tenant. However, the aforementioned lien shall be subsequent to the lien of any mortgage or deed of trust, covering the demised premises, which is serviced by an assignment of this lease or the rent payable hereunder. In the event, by reason of the Landlord's failure to complete the described improvements in the time and manner provided herein, the Tenant shall elect to effect or complete the improvements herein specified, the term of this lease shall commence upon Tenant's completion of said improvements or six (6) months from the date that the Tenant notifies the Landlord of its intention to complete said improvements, whichever shall first occur."

The plaintiffs did not within ten months (i. e. by April 28, 1957) complete the construction of the gasoline service station, being the "improvements" mentioned in the rider. Defendant elected not to exercise its option to complete the service station, and wrote plaintiffs on May 9, 1957, stating that it elected "that said lease shall be deemed cancelled and of no effect, as of the date hereof."

Plaintiffs filed suit within five weeks thereafter. After the complaint had been answered, and plaintiffs had replied to interrogatories, both sides moved for summary judgment. Chief Judge Thomsen in a thorough and comprehensive opinion denied recovery and directed the entry of judgment in favor of the defendant.[1] Nichols v. Cities Service Oil Company, D.C.Md.1957, 157 F.Supp. 554. On appeal, the judgment was reversed and the case remanded for further proceedings, Nichols v. Cities Service Oil Company, 4 Cir., 1958, 256 F.2d 521, because:

"Application of the doctrines of waiver, estoppel, and election requires a precise appraisal of the knowledge and situation of the parties at the times they acted * * * [T]he record here permits such a wide range of speculation as to the extent of the knowledge of the defendant at the crucial times, and as to other relevant matters, that resolution of the interesting legal questions raised appears dependent upon the liberality with which the pleadings are to be construed, and inferences drawn, in favor of the plaintiffs. The details necessary for a confident application of the legal principles are lacking here, and we

---

1. The judgment was "without prejudice to the right of Aurora Federal" Savings & Loan Association, the construction mortgage mortgagee, "to file an action against Cities Service if Aurora Federal suffers any loss under its mortgage." 157 F. Supp. 554, at page 560. Aurora Federal did not appeal, and has filed no suit in this court.

are of the opinion that, in the interest of justice, determination of the issues should await the taking of testimony and the completion of a record." (256 F.2d 521, 522).

On remand, the case came on for hearing, and two days were spent in testimony and argument, and briefs were thereafter filed. The bulk of the testimony was substantially in accordance with the summary made by Chief Judge Thomsen from the papers before him.[2] Based upon the oral and deposition testimony, the exhibits, the appearance and demeanor of the witnesses upon the stand [3], and the inherent probabilities, the court finds and rules as follows:

## The Facts

In 1955 and 1956, Nichols, an experienced real estate operator, and appraiser of filling stations for financial institutions,[4] and his wife, owned and were developing the Kent Island Shopping Center on the north side of new U.S.-Md. Route 50, near Stevensville, Queen Anne's County, Maryland, a short distance east of the Chesapeake Bay Bridge. Nichols also owned eleven acres on new Route 50, west of the motel (also owned by Nichols) which motel was adjacent to the Kent Island Shopping Center. A plat dated October 6, 1955, was prepared, showing the outlines of this property, and the location of a proposed fifty-foot road connecting old and new Route 50, and practically bisecting the eleven acre tract. At about the same time a plat of the eleven acres was prepared by James H. Ludlow, civil engineer, on which possible new types of business were indicated.[5] One of Nichols' employees contacted the various oil companies to interest them in a filling station.[6] A letter dated October 8, 1955 was sent to the various oil companies, the text of which is as follows:

"As you probably know, a new service station location on Route 50 has become available by reason of the recently completed service road leading to the Kent Island Shopping Center and Tourinns Motel. The road has access for east and west traffic at both ends of the service road.

"Several oil companies have already approached us to negotiate for this new location. We are now prepared to receive proposals from all companies interested in this location.

"We would like to suggest that you have your representative stop at our office in the Kent Island Shopping Center and contact me, and I will be glad to show you the planned location as well as give you some general idea of our plans for further development in this newly opened area."

This letter, it will be noted, refers to "a" new service station location; "this" new location; "this location"; and sug-

2. 157 F.Supp. 554. The additions and slight differences are such, however, that it will be easier and more coherent for the court to restate the facts, rather than incorporate Judge Thomsen's statements by reference, and then supplement them. A substantial amount of paraphrasing may be noticed, however.

3. Four of the six Cities Service officers and employees who testified were called and examined by plaintiffs.

4. Nichols had previously constructed an Esso station in his shopping center, and later built and completed a Gulf station across a fifty-foot road from the Cities Service site in question.

5. These included a theatre, clothing store, restaurant, tourist court, recreation building (roller skating, bowling, game room, boating) and a dock. Nichols described this as "purely somebody's dream" but admitted that he did mention to Cities Service's representatives possibilities of a skating rink and bowling alleys.

6. Plaintiffs contend that two stations, one on the southwest and the other on the southeast corners of new U.S. 50 and the fifty-foot road connecting old and new U.S. 50 were intended, and mentioned to Cities Service. Defendant insists that two service stations were never discussed. In the view the court takes of the whole case, it is not critical which contention is correct.

gests a visit to see "the planned location" and to receive "some general idea of our plans for further development in this newly opened area."

Thereafter discussions were had between representatives of Nichols (A. E. Benson) and Cities Service (W. S. Bagot). Bagot, called by the plaintiffs, testified that in these discussions there was never any talk about a second service station, but there was about the development of the area, and that Benson produced the Ludlow plat, and gave Bagot a copy. On the basis of anticipated development and Cities Service having the only service station, Bagot recommended to his superior that a lease be taken; and their joint recommendation was sent to New York. Benson, with whom these negotiations were held, was not available at the trial.

On January 9, 1956 Bagot wrote Benson confirming their conversation of January 6, 1956, "pertaining to the service station that is to be located in the Kent Island Shopping Center." Bagot suggested that Cities Service be given a thirty-day option on terms quite similar to the corresponding ones in the agreement as ultimately signed.[7] He asked for a legal description of the property.

Benson was then in the hospital, and M. W. Hardesty took over negotiations for Nichols. He replied to Bagot on January 13, 1956, stating that Bagot's proposal was "generally acceptable," subject to legal review and consideration of plans and specifications; declined to give an option or furnish a legal description at that time; said, however, that Nichols was "anxious to have your Cities Service Station at this location"; and asked for a copy of the proposed lease.

Hardesty testified that he, Bagot and Nichols had a discussion in Nichols' office in January 1956, after his letter of January 13; that the plan dated October

6, 1956 was shown to Bagot and he was given the choice of the northwest [sic] or northeast [sic] corners on new Route 50 and chose the northwest [sic] corner. Hardesty did not recall that any other plat was discussed; knew that Benson had the Ludlow plat; but did not know it had been given to Bagot.

Minimum rent was discussed, Bagot suggesting $375 a month, Hardesty $400; they split the difference and settled on $387.50. Financing was also discussed, and whether the Cities Service lease would be satisfactory to a lending institution.

Thereafter, the standard form of lease prepared by Cities Service was submitted. Paragraph 15 prohibited any other service station within 1500 feet. Hardesty said that he at once phoned Bagot and objected to this paragraph, on the ground that Nichols was offering land on both sides of the 50-foot road for filling stations.

Bagot's version is that in the conference with Hardesty and Nichols, permanent financing was discussed. Nichols said he did not want the balance of the eleven acres clouded with a restriction such as that in paragraph 15. Bagot said that other Cities Service stations had been financed through Philadelphia Savings Fund Society and that that institution would not lend on leases containing such a restriction, since the borrower could terminate the lease if a competitive station were built within 1500 feet.

On January 23, 1956, Hardesty wrote Bagot, giving a general description of the land to be leased to Cities Service, and referring to the plat of October 6, 1956.

Cities Service Option to Lease form was sent to Hardesty on February 8, 1956, and on February 10, 1956, Hardesty returned it unsigned, because of var-

7. Bagot suggested a twenty-year lease; one five-year renewal option; first refusal right on option to renew and purchase (all of which were in substance incorporated); and rental of 1½¢ per gallon with a minimum of $375 and a maximum of $475 per month. The agreement as signed called for $387.50 per month with 1½¢ per gallon on each gallon in excess of 25,833 gallons per month, "total and combined rent" not to exceed $475 per month.

ious objections, including lack of adequate location of the land to be leased; the proposed location of a sign; the inclusion of paragraph 15; and provisions in paragraph 16 as to the effect of governmental change in streets. A revised form was sent by Cities Service, which was executed by the Nichols in April 1956. It gave Cities Service the exclusive option to lease the premises on the terms contained in Cities Service standard form of lease, which lease was to provide that the Nichols should within six months from the date of the option, complete the filling station; provided that the option might be exercised by Cities Service within thirty (instead of the printed ninety) days from the date of the option; and eliminated paragraphs 15 and 16 of the standard form of lease.

By letter of April 30, 1956, a "Lease Agreement" was submitted by Cities Service. This had a number of eliminations from, amendments in, and additions to, the standard printed form, one of which (Rider to paragraph 2) gave the Nichols ten months, instead of six months, to build the filling station. In addition to the rider to paragraph 2, heretofore quoted, it contained a new paragraph 23, as follows:

"Tenant further covenants and agrees that it will not terminate this lease because of any default on the part of the Landlord without first giving written notice of such default to the mortgagee and allowing mortgagee a period of thirty (30) days after receipt of such notice of Landlord's default to remedy the same."

On May 8, 1956, Bagot wrote Hardesty requesting return of the lease agreement signed by Nichols; stated that Nichols could now make application for a loan, the lease being in form acceptable to the Philadelphia Savings Fund Society; and stating that the plans and specifications were being prepared.

On June 6, 1956, the Nichols executed the "Lease" in suit, in the form submitted on April 30, 1956. It was then transmitted to New York, where it was executed on behalf of Cities Service on June 28, 1956, which date was inserted in the first line of the agreement.

The court has reviewed in some detail the negotiations and events leading up to the execution of this instrument by the Nichols. It is apparent that the testimony discloses a conflict upon at least two points; whether Cities Service was to have the only service station on the eleven acres; and the extent of representation as to "proposed" developments. Were it necessary to choose between these conflicts, the court would find as facts that the negotiations did not disclose the intent of the Nichols to lease another filling station on the eleven acres, much less on new Route 50 within fifty feet of the Cities Service Station; and that Nichols definitely indicated intention of developing the balance of the eleven acres.[8] However, these representations were not incorporated in the lease as executed, and Cities Service at the trial disclaimed that they were part of the Nichols' "undertaking" and claimed only that they constituted the "understanding" of Cities Service.[9]

The changes in the printed form of lease had not been intialled by the parties. Cities Service requested that the

8. The letter of October 8, 1955, is definitely in terms of one station; the Ludlow plat likewise so indicates; there was already an Esso station in the shopping center; it would require an "artificial neighborhood" (as Cities Service Regional Manager testified) to support a single station, let alone two; the truth of which is pragmatically demonstrated by the fact that the Gulf station, fifty feet from the proposed Cities Service Station, had up to November 1958 paid only minimum rentals.

9. As will be explained, the court considers that Cities Service had an absolute, and arbitrary, in the sense of uncontrolled, right to refuse to exercise its option to complete the filling station in the event the Nichols did not do so within the 10 months from June 28, 1956. However, if justification or reason were required for such refusal, the court holds that these findings would be adequate justification.

Nichols do so. They agreed, but insisted that Cities Service do likewise. A fully initialled "lease" was returned to the Nichols in a letter dated July 18, 1956, with the statement that Cities Service trusted that Nichols would "now be in a position to proceed with the construction in the very near future."

Plans and specifications were sent by Cities Service to Nichols on July 19, 1956.

Nichols put the station "out to bid" shortly after receiving the plans and specifications. On August 13, 1956, a bid was received from Hervey A. and Albert J. St. Cyr, specialists in service station construction, to build the Cities Service Station for $26,600, undertaking to begin construction within 48 hours "after signing of contract and issuance of permits, and complete the project in 120 calendar days." A superseding bid was made on October 22, 1956, good for 90 days, for $25,800, construction to be begun within "48 hours after signing of contract", but with no specification as to completion time. A further superseding bid was made on February 1, 1957, identical with the one of October 22, 1956, except it was to hold for 60 days from date.

In September, 1956, Nichols obtained a commitment from Philadelphia Savings Fund Society for the permanent financing. Difficulty was also experienced in obtaining a construction loan. Finally, in December 1956, an oral commitment was obtained from Aurora Federal Savings & Loan Association (Aurora Federal). Hardesty so advised Bagot, who had been calling regularly about once every three weeks to see how the Nichols were getting on. The settlement date for the construction loan was set for February 20, 1957, on which date the Nichols transferred their interest in the site to Pennick Corporation, owned by the Nich-ols, and the loan was made to it. Cities Service was advised of these transactions.

On February 25, 1957, St. Cyr met with Cities Service's regional engineer. Some minor changes in the plans and specifications were made. St. Cyr stated that work would begin in about 10 days, depending on the weather. In fact, the construction agreement between Pennick Corporation and St. Cyr was not signed until March 2, 1957. It called for work to commence within 10 days, and to be completed within 90 working days, at a cost of $25,800.

Construction began on March 11, 1957. On that day one of Cities Service's engineers stopped by and helped establish grades. Engineers of Cities Service visited the site on four or five other occasions, up to and including May 9, 1957. On that day St. Cyr's foreman was asked to notify Cities Service as soon as the tanks were in the ground, so that Cities Service could put gasoline in.[10]

On April 11, 1957, St. Cyr had also started work on the Gulf station for Nichols, on the southeast corner of new Route 50 and the fifty-foot road, across from the Cities Service work. St. Cyr had no instructions to put any special effort on the Cities Service station[11]; he just followed normal procedure, working on both; the foreman and regular crew of three working sometimes on one, sometimes on the other. The Gulf station was completed late in July, in 90 working days.

During the first part of May, 1957, a Cities Service sign was delivered to the site, and certain instructions were given as to its erection, but it was never actually installed.

On April 28, 1957, the Cities Service station was less than sixty-five per cent completed.[12]

10. St. Cyr's foreman testified by deposition that the engineer "wanted the tanks put in as quick as possible and filled around, and he wanted me to call St. Cyr when I got the tanks in * * * So that he could call the Cities Service Oil Company to bring fuel and fill the tanks with fuel, that he didn't want any water in the tanks" as was usually done.

11. He testified that April 28, 1957 "did not mean anything" to him.

12. St. Cyr was the only one who testified percentagewise. He said that on May

On May 9, 1957, a vice president of Cities Service wrote Nichols, and referring to the "lease" said:

"You are hereby notified that because of your failure to complete within ten months from the date of said lease to the tenant's satisfaction the improvements in said lease required to be made by you, Cities Service Oil Company hereby elects that said lease shall be deemed cancelled and of no effect, as of the date hereof."

Counsel for the Nichols and Pennick Corporation replied on May 15, 1957, stating his conclusion that "you clearly have no legal grounds upon which to cancel the lease in question, and that it is binding upon you in all respects * * [Y]ou are hereby notified that my clients reject your effort to cancel the aforesaid lease and that they insist upon the performance of all your commitments and obligations under it * * * "

Cities Service did not communicate in any way with Aurora Federal, the construction loan mortgagee.

Knowledge and Situation of the Parties

The Court of Appeals, in remanding, did not indicate or define "the times", as to which "a precise appraisal of the knowledge and situation of the parties" was required,[13] or what were the "crucial times" at which the knowledge of Cities Service was to be determined.[14] This court has endeavored to state the facts from the initiation of negotiations down through May 9, 1957. It will now endeavor to apply these to the questions of waiver, estoppel and election, cited by the Court of Appeals; and to plaintiffs' further contentions, advanced in the hearing on the merits, that the ten-month completion period did not expire until May 18, 1957; and that the completion time was extended by failure of

Cities Service to give notice of "default" to Aurora Federal.

The court feels that the case has been clouded by the unfortunate designation of the agreement dated June 28, 1956 as a "Lease." It is an agreement by which a twenty-year lease would come into existence if Nichols satisfactorily completed the construction of a service station on or before April 28, 1957; or if Nichols did not so complete construction, but within two months after April 28, 1957, Cities Service elected to complete the improvements. The rider to paragraph 2 states that the "lease shall be deemed cancelled and of no effect" if neither contingency occurred. Really, unless one of the two contingencies occurred, the lease never became effective. This is recognized in the concluding portion of the rider, where it is provided that if Cities Service "shall elect to effect or complete the improvements herein specified, *the term of this lease shall commence*" on completion of construction by Cities Service or six months from notice by Cities Service of its election, whichever should first occur.

There was no obligation on Nichols to, or liability for failure to, start construction, or having started, to complete by April 28, 1957; there was only the option or right so to do, and thus bring into existence a twenty-year lease. There was no obligation on Cities Service, if Nichols did not start construction, or did not satisfactorily complete it by April 28, 1957, itself to erect or complete the service station, but only the right so to do, and thus bring into existence a twenty-year lease.

This somewhat slightly different approach leads to the same conclusion, reached by Chief Judge Thomsen, that time was of the essence of the agreement.[15]

10, 1957, the station was 65–70% completed; he did not know its status on April 28, 1957.

13. 256 F.2d at page 521.

14. 256 F.2d at page 522.

15. 157 F.Supp. at pages 557–558. See also Clarke v. Lacy, 1957, 213 Md. 482, 491, 132 A.2d 478, 483; Shea v. Marton, 1957, 214 Md. 539, 543, 544, 136 A. 2d 247, 249, 250.

### Waiver [16]

In their brief in this case, the Nichols assert that Chief Judge Thomsen "properly stated the law of waiver." This court concurs in this conclusion, and therefore on the law adopts this portion of that opinion, reading as follows:

"Waiver is the voluntary and intentional relinquishment of a known right. Waiver and estoppel are closely akin; the terms are sometimes loosely used interchangeably, but they are not synonymous. It is not hard to distinguish between an express waiver and estoppel, but the courts have often found it difficult to distinguish between implied waiver and estoppel. 56 Am.Jur., Waiver, §§ 2, 3, pp. 102–105.

"The general rule is that a waiver must be supported by an agreement founded on a valuable consideration, or the conduct on which a waiver is predicated must be such as to preclude a party from insisting on performance of the contract or a forfeiture of the condition. However, in the latter case, it is not a requisite, as in the case of a technical estoppel, that prejudice result to the party in whose favor the waiver operates. 56 Am.Jur., Waiver, § 16, p. 116; Schindel v. Danzer, 161 Md. 384, 396, 397, 157 A. 283. The general rule has been recognized in Maryland, but has not always been applied, especially in insurance cases. Schindel v. Danzer, supra; Enterprise Mfg. Co. v. Oppenheim, Oberndorf & Co., 114 Md. 368, 402, 79 A. 1007, 38 L.R.A., N.S., 548; McFarland v. Farm Bureau Mutual Auto Ins. Co., 201 Md. 241, 93 A.2d 551; Manufac-

turers Casualty Ins. Co. v. Roach, D.C.D.Md., 25 F.Supp. 852, and cases cited therein.

"Voluntary choice is of the very essence of waiver. It is a voluntary act which implies a choice by the party to dispense with something of value or to forego some advantage which he might, at his option, have demanded and insisted on. 56 Am. Jur., Waiver, § 12, p. 113, and cases cited above." 157 F.Supp. at page 558.

Under the facts in this case, Cities Service did not voluntarily and intentionally relinquish any known right. Presumably Nichols would seek to predicate waiver upon the encouragement represented by the repeated inquiries by Cities Service as to progress in securing financing by Nichols; its conference with Nichols and minor changes in plans on February 25, 1957; the failure to protest the beginning of work on March 11, 1957; and the delivery of a sign, and statement of intention to fill the tanks with gasoline, after April 28, 1957.

In none, or all, of these, does the court perceive any voluntary and intentional relinquishment of a known right. Cities Service's only "right" under the agreement was to require that the improvements, if completed by April 28, 1957, be reasonably in accordance with the plans and specifications; or if not so completed, the "right" to take two months in which to decide if it (Cities Service) would or would not, build or complete. Cities Service had no "right" to forbid Nichols to begin construction at any time. Had it attempted to do so, a suit for improper interference might well be before the court, instead of this one.[17]

---

16. Nichols in their brief treat waiver and estoppel together.

17. Accordingly, there is no merit in the contention, strenuously urged by Nichols, that the station could not have been completed before April 28, 1957, and there was thus some unfairness in the failure of Cities Service to warn Nichols not to be-

gin or to forbid Nichols to begin. Nichols was an experienced builder, and was in a position to determine for himself the time required. Furthermore, while usually construction covered 90–120 days, there was testimony as to one service station having been erected in 42 days, and another in 72 days.

### Estoppel

■ Nor is there any estoppel. No action, or inaction, misled Nichols into taking any action he would not otherwise have taken; or into the belief that Cities Service would voluntarily agree to a modification of the contract between the parties, or would itself elect to complete the project. Nichols knew as well as Cities Service of the improbability that the construction would be completed by April 28, 1957. Without seeking any amendment, or inquiring of Cities Service as to its intentions, if any, Nichols at his own risk took the chance of (1) completing construction on time; or (2) of Cities Service electing to complete construction; or (3) of securing a new or modified agreement with Cities Service; or (4) of completing the station on his own account, and operating it himself, or renting it to someone else.[18]

The facts in this case do not fall within the definition of estoppel in the Maryland decisions. In Fitch v. Double "U" Sales Corp., 1957, 212 Md. 324, 338–339, 129 A.2d 93, 101, the court said:

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which may have otherwise existed, either of property, of contract or of remedy, against another person who has in good faith relied upon such conduct and has been led thereby to change his position for the worse, and who on his part acquired some corresponding right either of property, of contract or of remedy. Whatever may be the real intention of the parties making the representation, it is absolutely essential that this representation, whether consisting of words, acts or silence, should be believed and relied upon as the inducement or action by the party who claims the benefit of the estoppel

and that, so relying upon it and induced by it, he should have taken some action. The cases all agree that there can be no estoppel unless the party who alleges it relied upon the representation and was induced to act by it and thus relying and induced took some action on that representation. * * * Equitable estoppel operates to prevent a party from asserting his rights under a general technical rule of law, when that party has so conducted himself that it would be contrary to equity and good conscience to allow him to do so."

See also Crane Co. v. Onley, 1949, 194 Md. 43, 69 A.2d 903, cases cited in Fitch v. Double "U" Sales Corp., supra, and Born v. Stancills, Inc., 1957, 214 Md. 443, 135 A.2d 843.

### Election

■ Nichols "strongly" urges that Cities Service "elected to permit the Plaintiffs to finish the station." A number of authorities are cited, including Bierce v. Hutchins, 1907, 205 U.S. 340, 346, 27 S.Ct. 524, 525, 51 L.Ed. 828. ("So a man may * * * keep in force or may avoid a contract after the breach of a condition in his favor."); Plymouth Village Fire Dist. v. New Amsterdam Casualty Co., D.C.N.H.1955, 130 F.Supp. 798, 801 ("When the injured party treats the contract as operative after knowledge of the breach * * * he is deemed to have elected not to assert the breach as cause for refusing to continue the contract."); Williston on Contracts, Rev. Ed., section 683:

"Election * * * is * * * where a person has the choice of one of two alternative and inconsistent rights or remedies. In choosing the one, he necessarily surrenders the other. * * * Thus where a contract is *broken* in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing

---

18. While the facing of the service station was distinctive, it could without great expense be converted into a station for another company.

to go on. If he chooses to continue performance he has doubtless lost his right to stop performance; * * * It * * * involves no requirement of mutual assent. * * * *Election* to take advantage of *breach* of condition in a contract *generally need not be exercised until the time arrives when, by the terms of the contract, the party entitled to elect must render some performance.* Then either performing or failing to perform will indicate an election. Even prior to that time, however, any conduct which under the circumstances is deceptive except on the assumption that a choice has been made, may amount to an election." (Emphasis supplied).

With the quoted principles there can, perhaps, be no quarrel. They are not, however, applicable to this case. There had been no breach of contract by Nichols at any time. There was accordingly no obligation, or opportunity, for Cities Service to elect whether or not to treat a nonexistent obligation as broken, or to waive a breach which had not occurred. Nor had Cities Service contracted that in the event construction was not begun by Nichols, or if begun, was not completed by April 28, 1957, it would build or complete. Cities Service had a two-month period in which to elect, not whether it would hold Nichols, but whether it would itself build or complete.

In an agreement such as that of June 28, 1956, where Nichols was given until April 28, 1957, an option to build, there was simply no place after April 28, 1957 for the application of the doctrine of election to the expired option. The only election then available was that by Cities Service to complete, or not to complete, the service station.[19]

### Expiration Date of Nichols' Option

The agreement between the parties was signed by the Nichols on June 6, 1956, but they failed to initial certain changes then appearing in the instrument. The agreement was executed on behalf of Cities Service in New York on June 28, 1956. Cities Service returned it to the Baltimore office, with the request that Nichols initial the changes. Nichols did so, but insisted that Cities Service do likewise. The agreement was then returned to New York, where it was initialled, and redelivered to Nichols about July 18, 1956.[20] From this it is argued that Nichols' ten month period did not expire until May 18, 1957. To this there are at least two entirely satisfactory answers.

(a) The agreement became effective when executed on behalf of Cities Service on June 28, 1956. This was the identical document previously signed by the Nichols. All changes had been made before the Nichols signed. No changes were subsequently made. The instrument actually signed embodied the entire agreement. Initialling of changes might be desirable to avoid future controversy as to when the changes were made. It

19. Nichols seeks to inject election into this case by virtue of the language in Cities Service's letter of May 9, 1957; "Cities Service Oil Company hereby elects that said lease shall be deemed cancelled and of no effect as of the date hereof."

For the reasons above given, Cities Service could "elect" only to complete, or not to complete, the unfinished station. The language has, however, a perfectly normal construction and operation within the provisions of the agreement. Cities Service had the right to "elect, by written notice to the Landlord within two (2) months after" April 28, 1957, "to effect and complete said improvements" failing which "this lease shall be deemed cancelled and of no effect." Cities Service was not obligated to wait until the last day of the two month period, to elect to complete or not to complete; it could make this "election" at any time within the two months. Its letter of May 9, 1957, clearly stated its election not to complete the station, and then stated the consequence, in the very words of the agreement, that thereby as of the date of such election the "lease shall be deemed cancelled and of no effect."

20. This date is used in Nichols' brief. The court's notes indicate the date to be July 21, 1956.

would not alter the true facts, but might be of evidentiary value if the time the changes were made were ever disputed or put in issue. No such dispute exists and no such issue has been tendered. In fact, the complaint herein alleges (paragraph 4) that "On or about June 28, 1956, the Plaintiffs * * * entered into the aforesaid lease * * *" In paragraph 8 of the complaint, it is averred that when construction began on March 11, 1957, it was or should have been known that construction could not be completed by April 28, 1957, as provided in the rider to paragraph 2, quoted in full in this opinion.

(b) The rider to paragraph 2 expressly fixes the time for completion by Nichols of the improvements as "within ten (10) months from the *date* of this lease * * *" It is conceded that the "lease" is *dated* June 28, 1956. Ten months from June 28, 1956, must be April 28, 1957, no matter when the agreement was executed.

### Failure of Cities Service to give Notice under Paragraph 23

■ Paragraph 23 of the agreement, previously quoted, provides that Cities Service "will not terminate this lease because of any default on the part of the Landlord without first giving written notice of such default to the mortgagee and allowing mortgagee a period of thirty (30) days after receipt of such notice of Landlord's default to remedy the same." The Nichols say this was not done. Why it should have been done, and if so, how it would have helped the Nichols in this case, is not explained. To the court it is obvious that the language could be applicable only to a mortgagee whose lien arose after the twenty-year lease became effective.

(a) Cities Service did not terminate the lease; the lease had not, and never did, become effective.

(b) There was no "default" on the part of Nichols of which notice could be given. Default can arise only by breach of an obligation; the Nichols were not obligated to do anything.

(c) A notice to Aurora Federal after April 28, 1957 of the fact that Nichols had not completed construction by April 28, 1957 would not have permitted Aurora Federal within thirty days (or 30,000,000 years) to have completed construction by April 28, 1957—a date already passed.

This argument by Nichols points up the complete impossibility of decreeing specific performance in this case. Suppose that—contrary to this court's express holding—something before, or even after, May 9, 1957, could be held to extend the completion date of April 28, 1957, it would still seem that insuperable obstacles to an enforceable agreement would exist. How much longer would the Nichols have to complete the station? If the answer is "a reasonable time", what is a reasonable time? And if Nichols' time for completion be extended, beyond April 28, 1957, then, regardless of the length of such extension, would the Nichols be *obligated*, or only entitled, to complete within such time; that is, if the Nichols again failed to complete,[21] would they be liable in an action by Cities Service for specific performance; would they be liable for damages; or is the only consequence that Cities Service two-month period of election then starts? What did Cities Service waive into or out of, estop itself from, or elect between?

The plaintiffs are not entitled to specific performance, or any other relief. The clerk is directed to enter judgment for the defendant.

The foregoing opinion embodies the court's findings of fact and conclusions of law in accordance with F.R.Civ.P. 52(a), 28 U.S.C.A.

---

21. E. g., because the Gulf station was in operation, and Nichols did not believe the two stations could live within fifty feet of each other.