979 A.2d 299

**HARTFORD UNDERWRITERS INSURANCE COMPANY**

v.

**Wilma I. PHOEBUS, et al.**

**No. 758, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Aug. 31, 2009.

670

Edward A. Jaeger, Jr., (White & Williams, LLP on the brief), Philadelphia, PA, for appellant.

Sara Frey (Josh M. Greenbaum, Cozen O'Connor, Michael J. Scheyer, Seidman & Schreyer, LLC on the brief) David E.C. Grant (O'Connor, Grant & Samuels on the brief), Towson, for appellee.

Panel: SALMON, DEBORAH S. EYLER and GRAEFF, JJ.

DEBORAH S. EYLER, J.

In the Circuit Court for Calvert County, Hartford Underwriters Insurance Company ("Hartford"), the appellant, as subrogee of K.B.K., Inc. ("K.B.K."), sued John L. Mattingly Construction Co., Inc. ("Mattingly") and Wilma L. Phoebus d/b/a Wilma Phoebus Electric Company ("Phoebus"), the appellees, for negligence, breach of contract, and breach of warranties. After a hearing, the court granted summary judgment in favor of the appellees. The appellants challenge that ruling on appeal.

## FACTS AND PROCEEDINGS

On October 18, 2002, K.B.K. as "Owner" and Mattingly as "Contractor" entered into an American Institute of Architects ("AIA") form contract number A107–1997 ("Contract") to

build an Arby's Restaurant ("Restaurant") in Dunkirk. Mattingly hired various subcontractors, including Phoebus for electrical work. Construction was finished and the Restaurant opened for business in October 2003. K.B.K. made final payment on the Contract on January 30, 2004. Sometime thereafter, K.B.K. purchased a property insurance policy for the Restaurant from Hartford, with effective coverage dates of October 1, 2004, through October 1, 2005.

On May 8, 2005, a fire broke out in the Restaurant, causing substantial damage. K.B.K. submitted a claim to Hartford for property damage totaling $1,117,711.26. Hartford paid the claim, minus a $1,000 deductible paid by K.B.K.

In the Circuit Court for Calvert County, Hartford, as subrogee of K.B.K., sued Mattingly and Phoebus on theories of negligence, breach of contract, and breach of warranties, alleging that, during construction of the Restaurant, they installed and/or supervised the installation of defective electrical wiring, related components, and equipment, all of which caused the fire. After discovery began, Mattingly and Phoebus filed motions for summary judgment, asserting that a "Waivers of Subrogation" clause in the Contract barred Hartford from pursuing the liability claims against them. Specifically, they argued that K.B.K. had agreed in the Contract to look only to its own property insurance to cover perils such as fire, and therefore Hartford had no subrogation rights to enforce.

Hartford opposed the motions and also filed a cross-motion for partial summary judgment, arguing that the Waivers of Subrogation clause did not apply to the fire loss as the loss had occurred after the Restaurant was built and paid for. Mattingly filed a reply and an opposition to the cross-motion for partial summary judgment, and Phoebus filed a supplemental memorandum in support of its motion for summary judgment.

The circuit court conducted a hearing on the motions and held the matter *sub curia*. Thereafter, by memorandum and order, it granted summary judgment in favor of Mattingly and

Phoebus and denied Hartford's motion for partial summary judgment.[1] Hartford noted this timely appeal.

## DISCUSSION

### Pertinent Contract Provisions and Ruling of the Circuit Court

The Contract is an "Abbreviated Standard Form of Agreement Between Owner and Contractor for Construction Projects of Limited Scope Where the basis of payment is a STIPULATED SUM." It designates K.B.K. as the "Owner" and Mattingly as the "Contractor" and states "the Project is" the Arby's Restaurant in Dunkirk. For our purposes, the following Contract provisions are relevant.

In Article 16, entitled "INSURANCE," Paragraph 16.4.1 required K.B.K. to have property insurance in place during construction:

> **Unless otherwise provided, the Owner shall purchase and maintain ... property insurance on an "all-risk" policy form,** including builder's risk, in the amount of the initial Contract Sum, plus the value of subsequent modifications and cost of materials supplied and installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. **Such property insurance shall be maintained ... until final payment has been made as provided in Paragraph 14.5 or until no person or entity other than the Owner has an insurable interest in the property required by this [paragraph] to be covered, whichever is later.**

---

1. Hartford earlier had amended its complaint to add Atlantic Design & Construction, Ltd. ("Atlantic"), a carpentry subcontractor, as a defendant. Atlantic was served with the amended complaint but did not answer. The court entered a judgment of default, which Atlantic did not move to vacate. There never was a damages hearing on the default order. In the court's order granting summary judgment to Mattingly and Phoebus, the court also "dismissed [the case] with prejudice." We take that to mean that Hartford's claims against Atlantic (and all cross-claims) were dismissed. None of the parties to this appeal challenge that ruling.

(Emphasis added.) Section 16.5, entitled "WAIVERS OF SUBROGATION," then provides, at Paragraph 16.5.1:

> The Owner and Contractor waive all rights against ... each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other ... for damages caused by fire or other causes of loss **to the extent covered by property insurance obtained pursuant to Paragraph 16.4 or other property insurance applicable to the Work,** except such rights as they have to proceeds of such insurance.... **The policies shall provide such waivers of subrogation by endorsement or otherwise.**

(Emphasis added.)

It is undisputed that the fire loss was not covered by the property insurance K.B.K. obtained pursuant to Paragraph 16.4, as that insurance no longer was in place when the fire occurred (nor should it have been). Whether, when the fire loss occurred, Hartford's subrogation rights were waived thus depends largely upon the meaning of "covered by ... other property insurance applicable to the Work," in Paragraph 16.5.1. "The Work" is defined at Contract section 6.3 to mean,

> **the construction and services** required by the Contract Documents, **whether completed or partially completed,** and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. **The Work may constitute the whole or a part of the Project.**

(Emphasis added.)

It is also relevant that, in Section 14.5, entitled "FINAL COMPLETION AND FINAL PAYMENT," Paragraph 14.5.3 states:

> **The making of final payment shall constitute a waiver of claims by the Owner except those arising from:**
>
> .1 liens, claims, security interests or encumbrances arising out of the Contract and unsettled;
>
> .2 **failure of the Work to comply with the requirements of the Contract Documents;** or

.3 terms of special warranties required by the Contract Documents.

(Emphasis added.) (We shall refer to this clause as the "Final Payment Waiver Exception.")

In support of their motions for summary judgment, Mattingly and Phoebus argued that K.B.K.'s property insurance policy with Hartford was "other property insurance applicable to the Work," within the meaning of the Waivers of Subrogation clause (Paragraph 16.5.1); therefore, Hartford, as K.B.K.'s subrogee, could not recover against Mattingly or Phoebus (or any other subcontractor) sums it paid K.B.K. on the property insurance claim. In other words, as long as K.B.K. had property insurance coverage for the Restaurant, the Waivers of Subrogation clause remained in effect, post-construction and post-final payment, and damage to the Restaurant from fire (or other perils) would be compensated only by the insurance, not by the parties to the Contract or their subcontractors or agents, notwithstanding fault.[2]

Hartford asserted in opposition that the temporal scope of the Waivers of Subrogation clause *vis-à-vis* losses to the completed Restaurant covered by Owner-obtained insurance is at best ambiguous, so that its meaning was a genuine dispute of material fact barring summary judgment. In its cross-motion for partial summary judgment, Hartford made the alternative argument that if the Waivers of Subrogation clause was not ambiguous, it only reasonably could be read as *not* applying to the completed Restaurant. Therefore, K.B.K.'s right of recovery against Mattingly and Phoebus for the fire loss remained intact, and Hartford was subrogated to that right.

The circuit court ruled that the pertinent Contract language was clear and the Waivers of Subrogation clause still governed the legal relationship between K.B.K. and Mattingly (and their subcontractors and agents) with respect to the fire loss to the

---

**2.** For ease of discussion, and only when necessary to draw a distinction, we shall refer to the Restaurant post-construction and post-final payment as the "completed Restaurant."

completed Restaurant because K.B.K. had property insurance coverage in effect when the fire loss was sustained. It reasoned:

> **Based on the language in the [Contract], "Work" means construction, even after final payment. Thus, this court finds that there was "other insurance applicable to the Work** [*i.e.,* the Hartford policy]." Therefore, because the damages were caused by fire and were covered by other insurance applicable to the Work, [K.B.K.] waived all rights against [Mattingly and Phoebus] under paragraph 16.5.1 of the [Contract].... [S]ince this court finds that K.B.K .... waived its right to bring suit, Hartford ... also cannot bring suit against [Mattingly and Phoebus].

(Emphasis added.)

### *Question Presented and Standard of Review*

■■■ Hartford poses one question for review, which, stripped of argument, asks whether the circuit court erred in ruling that the Waivers of Subrogation clause in the Contract applied to the fire loss to the completed Restaurant. We review this question *de novo,* for two reasons. First, on appeal, a decision granting summary judgment always is subject to *de novo* review, as an issue of law. *See Prison Health Servs., Inc. v. Baltimore County,* 172 Md.App. 1, 8, 912 A.2d 56 (2006). Like the circuit court, we decide whether, on the summary judgment record, the forecasted facts do not generate a genuine dispute of material fact and, on the undisputed material facts, the moving party is entitled to judgment as a matter of law. *See Miller v. Bay City Prop. Owners Ass'n, Inc.,* 393 Md. 620, 632, 903 A.2d 938 (2006). Second, the meaning of contract language, including whether language in a contract is ambiguous, is a pure question of law, which we review *de novo. Sy–Lene of Wash., Inc. v. Starwood Urban Retail II, LLC,* 376 Md. 157, 163, 829 A.2d 540 (2003).

### *Analysis*

The issue in this case concerns the temporal scope of the Waivers of Subrogation clause in the Contract; more specifi-

cally, whether the subrogation waiver was triggered when K.B.K. obtained property insurance with fire loss coverage on the completed Restaurant.

■ Waivers of Subrogation clauses commonly appear in construction contracts. "Construction contracts often contain provisions which require the parties to waive their right to claim damages against one another up to the amount of insurance coverage available for their losses." 4 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., BRUNER & O'CONNOR ON CONSTRUCTION LAW § 11:100, at 306 (2002). A subrogation waiver "is a risk-shifting provision premised upon the recognition that it is economically inefficient for parties to a contract to insure against the same risk." *TX. C.C., Inc. v. Wilson/Barnes Gen. Contractors, Inc.*, 233 S.W.3d 562, 567 (Tex. App.2007). As a matter of policy,

> subrogation waiver[s] encourage[ ] parties [to a construction contract] to anticipate risks and to procure insurance covering those risks and also facilitate[ ] and preserve[ ] economic relations and activity. Because a property owner can generally acquire insurance to protect the property against fire and other perils, in the context of a construction contract, the waiver of subrogation clause shifts the ultimate risk of loss resulting from such perils to the owner to the extent the damages are covered by insurance. The intent is to avoid disruption during construction and provide certainty and eliminate litigation by having the contracting parties look only to the owner's insurance for protection in the event of loss resulting from fire or other perils. In other words, a waiver of subrogation clause substitutes the protection of insurance for the uncertain and expensive protection of liability litigation.

*Id.* at 567–68 (citations omitted). Generally, waivers of subrogation clauses are included in construction contracts "to cut down the amount of litigation that might otherwise arise due to the existence of an insured loss." 4 BRUNER & O'CONNOR, *supra*, § 11:100, at 306–07.

The Court of Appeals has explained the well-established rules of contract interpretation as follows:

"Maryland adheres to the principle of the objective interpretation of contracts." *Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 710 (2007). The court will " 'giv[e] effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean.' " *United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946–47 (2004)). "Thus, our search to determine the meaning of a contract is focused on the four corners of the agreement." *Cochran*, 398 Md. at 17, 919 A.2d at 710 (citing *Walton v. Mariner Health*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006)). "[E]ffect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167, 198 A.2d 277, 283 (1964).

*Clancy v. King*, 405 Md. 541, 557, 954 A.2d 1092 (2008).

 Contract language is ambiguous "if, to a reasonable person, [it] is susceptible of more than one meaning or is of doubtful meaning." *Cochran, supra*, 398 Md. at 17, 919 A.2d 700. In deciding whether contract language is ambiguous, we may consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *See Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486 (1985).

Our initial focus in interpreting the Contract in this case must be on the meaning of the phrase "other property insurance applicable to the Work," in the Waivers of Subrogation clause; and that in turn depends upon the meaning of the Contract's definition of "Work," which we shall repeat:

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials,

equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

If the definition of "Work" plainly includes the completed Restaurant, K.B.K.'s Hartford insurance policy is "other property insurance applicable to the Work" and the Waivers of Subrogation clause was operative when K.B.K. obtained the Hartford insurance policy. Conversely, if the definition of "Work" plainly does not include the completed Restaurant, the Waivers of Subrogation clause had no effect when the fire loss was sustained and Hartford, as K.B.K.'s subrogee, was free to pursue liability claims against Mattingly and the subcontractors. Finally, if the meaning of "Work" (and therefore the meaning of "other property insurance applicable to the Work") is ambiguous, we must employ the canons of contract interpretation to determine its significance.[3]

There are no Maryland cases interpreting the construction contract phrase "other property insurance applicable to the Work" (or the definition of "Work") in any AIA contract. The parties cite cases from other jurisdictions that have done so in the context of other, more comprehensive, AIA contracts. In all but one of those cases, the contracts have contained a Waivers of Subrogation clause *and* a related "Completed Project Insurance" clause that must be read and understood together. The typical Completed Project Insurance clause reads:

"[I]f after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with [the waivers of subrogation clause] for damages caused

---

3. Ordinarily, when contract language is ambiguous, extrinsic evidence may be introduced to aid in determining its meaning. *Pac. Indem. Co.,* *supra,* 302 Md. at 389, 488 A.2d 486. The parties here agree that there is no such extrinsic evidence. "The court may construe an ambiguous contract if there is no factual dispute in the evidence." *Id.; see also* *Truck Ins. Exch. v. Marks Rentals, Inc.,* 288 Md. 428, 433, 418 A.2d 1187 (1980).

by fire or other perils covered by this separate insurance...."

See Town of Silverton v. Phoenix Heat Source Sys., Inc., 948 P.2d 9, 11 (Colo.Ct.App.1997) (quoting the contract in question).

In Silverton, the Town entered into a contract with a builder to install a new roof on the town hall. A little more than a year after the new roof was completed and paid for, it was damaged by fire. The loss was covered by the Town's property insurance. After the insurer assigned its subrogation rights to the Town, the Town sued the builder and various subcontractors, alleging that their defective work on the new roof had caused the fire. The lower court granted summary judgment against the Town based on a subrogation waiver provision in the construction contract.

On appeal, the court examined the contract's Waivers of Subrogation clause in tandem with its Completed Project Insurance clause, and concluded they were not ambiguous as to temporal scope. Noting that nothing in the Waivers of Subrogation clause reflected an intention on the part of the contracting parties to limit the waivers to liability for damages occurring before final payment, and that, consistent with that, the Completed Project Insurance clause expressly allowed the owner (the Town) to obtain property insurance on the project after completion and final payment, the court found the co-existence of property insurance and subrogation waivers after project completion and payment significant:

Because property insurance applicable to the work ... may remain in effect after the final completion date, so too may a waiver of subrogation rights [in the contract] remain in effect.

Id. at 13. On that basis, the Silverton court held that "the waiver of subrogation clause [in the contract] barred subrogation for insured losses to the [W]ork occurring after the final completion date and the date final payment was made." Id.

Likewise, in Colonial Properties Realty Ltd. Partnership v. Lowder Construction Co., 256 Ga.App. 106, 567 S.E.2d 389

(2002), the court read an AIA contract's Waivers of Subrogation clause (and definition of "Work") together with its Completed Project Insurance clause to plainly mean that the owner of an apartment complex had waived its liability rights against the builder for a fire loss sustained after the complex was built and paid for. The loss was paid by the owner's property insurer. The court held that subrogation waivers in the construction contract between the owner and builder remained in force when the loss was sustained post-completion and post-payment, because the owner had obtained property insurance covering the loss. The court reasoned that the two clauses in combination forecasted the parties' intention that the owner could obtain property insurance on the completed project and that, in that situation, the parties would look to insurance proceeds, not to each other, to pay for covered losses.

So, too, in *TX. C.C., Inc., supra,* 233 S.W.3d 562, the court observed that the AIA contract definition of "Work," which included construction and services " 'whether completed or partially completed,' " (emphasis removed) and the contract's Completed Project Insurance clause were clear when read together:

[F]inal payment does not result in waiver of any claims resulting from noncomplying work unless the damage is caused by fire and covered by property insurance obtained pursuant to [any of the property insurance clauses] or other property insurance that covers the work.

*Id.* at 570–71.

By contrast, in *Lumbermens Mutual Casualty Co. v. Grinnell Corp.,* 477 F.Supp.2d 327 (D.Mass.2007), the court concluded that an AIA contract's Waivers of Subrogation clause and "Work" definition were ambiguous, even when the contract included a typical Completed Project Insurance clause. The court read the " 'property insurance is *to be provided* on the completed Project' " language in the Completed Project Insurance clause (emphasis added) as giving the owner the option to obtain post-completion property insurance and concluded that, in that situation, the subrogation waivers did *not*

continue in force. The court reasoned that, notwithstanding that the definition of "Work" included completed construction and services, unless the parties to the contract expressly and plainly *required* the owner to obtain post-completion, post-payment property insurance, the contract language only could be read as manifesting an intention *not* to waive subrogation rights after completion and final payment.

In *Midwestern Indemnity Co. v. Systems Builders, Inc.,* 801 N.E.2d 661 (Ind.Ct.App.2004), in which the AIA contract contained both clauses, the majority adopted the reasoning in *Silverton,* holding that the subrogation waivers continued post-completion and final payment, so long as the owner in fact had property insurance during that time, regardless of whether the contract required the builder to obtain property damage insurance on the completed project. The dissenter would have adopted the reasoning in *Lumbermens,* to hold that the subrogation waivers did not survive completion because the Completed Project Insurance clause, as the dissenter read it, did not *mandate* the owner to obtain property insurance for the building after completion and final payment.

*Automobile Insurance Co. of Hartford v. United H.R.B. General Contractors, Inc.,* 876 S.W.2d 791 (Mo.Ct.App.1994), is the only relevant reported case we have found in which a court considered the temporal scope of an AIA Waivers of Subrogation clause that was not interrelated with a Completed Project Insurance clause.[4] In *United H.R.B.,* as here, the parties' contract contained a waiver of all claims "for damages caused by fire or other perils to the extent covered by . . . any other property insurance applicable to the Work," with "the Work" "compris[ing] the *completed construction* required by the Contract Documents." *Id.* at 792–93 (emphasis added). The court determined that the Waivers of Subrogation clause and the definition of "Work" were ambiguous as to whether the waivers would or even could continue after building completion and final payment.

---

4. The *United H.R.B.* opinion makes no mention whatsoever of a Completed Project Insurance clause in the contract.

■ To discern the meaning of the ambiguous contract language, the court examined other parts of the contract, in an effort to harmonize them. In particular, it noted that the contract also included (as does the Contract here) a Final Payment Waiver Exception clause. (By making final payment, the owner waived all claims, " 'except those arising from faulty or defective Work.' " *Id.* at 794.) It concluded that the plain language of that clause was inconsistent with an interpretation of the Waivers of Subrogation clause as surviving beyond the time of final payment. Reasoning that the Final Payment Waiver Exception clause is more specific than the Waivers of Subrogation clause, the court held that the Waivers of Subrogation clause necessarily terminated upon completion of the project and final payment. It explained:

> We agree that "work" includes the completed structure, but only for the time interval between the completion of the building and final payment. *We find that the completed structure is no longer "work" after final payment is made and therefore the waiver of claims only applies to the completed structure up to the time of final payment.*
>
> As a matter of construction, [the Waivers of Subrogation clause] is a general waiver provision whereas [the Final Payment Waiver Exception clause and other related final payment provisions] deal[ ] specifically with waivers which result from the making of final payment.... [I]n construing contradictory provisions, we give preference to specific provisions over general provisions.
>
> A reasonable construction of the contract which reconciles [the two paragraphs] is that ... [the Waivers of Subrogation clause] ... is applicable prior to final payment and [the Final Payment Waiver Exception clause is] ... effective after final payment. We find that the making of final payment terminated the general waiver of [the Waivers of Subrogation clause]....

*Id.* at 794–95 (emphasis added).

■ With these decisions in mind, we return to the threshold question whether the Contract's Waivers of Subrogation

clause is ambiguous as to its temporal scope, *i.e.*, as to whether it could be effective after the Restaurant was completed or whether it terminated upon completion of the Restaurant.

Hartford asserts that the language of the Waivers of Subrogation clause is unclear as to whether the waivers are or can be in effect after completion when the completed Restaurant is covered by a property insurance policy; and that (as in *United H.R.B.*), the circuit court's interpretation of "Work" to mean the completed Restaurant is inconsistent with Paragraph 14.5.3.2, by which K.B.K., as Owner, retained, after final payment, its claims arising out of the Contract for "failure of the Work to comply with the requirements of the Contract Documents." Hartford also argues that the public policy considerations that underlie subrogation waivers in construction contracts only are implicated during construction, and not afterward.

Mattingly and Phoebus counter that the Contract language is clear and plainly means that, because K.B.K. obtained "other property insurance applicable to the Work," *i.e.*, property insurance on the completed Restaurant, the Waivers of Subrogation clause continued in effect after the Restaurant was completed. Therefore, because at the time of the fire K.B.K. had property insurance that covered the fire loss to the Restaurant, K.B.K. continued to waive its right to recover against Mattingly (and its subcontractors and agents) on any liability claim, and Hartford did not have any subrogation rights to pursue.

We conclude that the Waivers of Subrogation clause and definition of Work in this Contract, existing as they do without a related Completed Project Insurance clause, are not clear as to temporal scope. In the cases discussed above in which the contracts included Waivers of Subrogation clauses *and* Completed Project Insurance clauses, the words in the Completed Project Insurance clause informed the meaning of the words in the Waivers of Subrogation clause. Completed Project Insurance clauses refer expressly to property insurance on the

completed project being in effect in the future and link that future circumstance to a continuation of the subrogation waivers. The two clauses read together plainly cover the time periods during construction *and* after completion. (Indeed, the only disagreement in contract interpretation when the two clauses have co-existed in one contract is whether the phrase "is to be provided" means must provide, and, if not, whether the subrogation waivers continue even when the owner is not required to obtain property insurance on the completed project, but has such insurance in place. *Compare Lumbermens, supra,* 477 F.Supp.2d 327, and *Midwestern Indem. Co., supra,* 801 N.E.2d at 675–77 (dissenting opinion), with *Silverton, supra,* 948 P.2d 9; *Colonial Props., supra,* 256 Ga.App. 106, 567 S.E.2d 389; *Midwestern Indem. Co., supra* (majority opinion); *TX. C.C., supra,* 233 S.W.3d 562.)

There is no Completed Project Insurance clause in the Contract. Nor is there any other language plainly addressing the waiver of rights consequences, if any, that flow from the owner's obtaining property insurance on the completed Restaurant. Without a Completed Project Insurance or similar clause, the Waivers of Subrogation clause and the definition of Work reasonably can be read to have more than one meaning, temporally.

Within the definition of "the Work," there are competing phrases that produce competing temporal concepts of that term. The phrase "construction and services required by the Contract" references *the actions* needed to fulfill the Contract, *i.e.,* what must be done to perform the Contract. By necessity, those actions will have taken place before completion of the Restaurant, and will not take place after. In contrast, the phrase "[t]he Work may constitute the whole or a part of the Project," can be read to reference *the thing* that is produced by the performance, *i.e.,* the completed Restaurant, at any time. Yet, that phrase also can be read simply as qualifying the first sentence, *i.e.,* explaining that "the Work" can mean all of the actions that need to be done to constitute performance of the Contract or a part of the actions that need to be done to constitute performance. In addition, the phrase

"whether completed or partially completed," which modifies "construction and services required by the Contract Documents," does not clarify whether "complet[ion]" means the finishing of all actions required to be taken under the Contract or the completed Restaurant itself. Either reading is reasonable, but only one reading would have "the Work" continue to exist after the building was fully constructed and paid for.

The ambiguity continues in (for our purposes) the critical language in the subrogation waivers clause: that the owner and contractor waive all rights against each other "for damages caused by fire . . . to the extent covered by . . . other property insurance applicable to the Work." If that phrase was meant to have the broadest meaning, so as to include property insurance covering the completed Restaurant, with no time limitation, the word "Project" rather than the word "Work" would have been used. "Project" is clearly defined in the Contract to mean the Restaurant, with no time limitation. "[P]roperty insurance applicable to the Project" plainly would have meant such insurance on the Restaurant after completion. That word was not used, however, and "Work," a word fraught with ambiguity, in fact was used.

The Final Payment Waiver Exception clause does not remove the ambiguity. As pertinent to the issue here, that clause states, in essence, that, by making final payment, the Owner does *not* waive any claim he might have that the Work does not comply with the Contract documents. The clause thus references the future, in that any such claim necessarily would be made in the time period after the Restaurant is built and paid for. The clause does not, however, shed any light on the precise meaning of "the Work" or whether, if such a claim is brought, the Waivers of Subrogation provision would be revived.

■ In construing ambiguous contract language, a court's objective is to give effect to the general purpose and intentions of the parties. *See County Comm'rs v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 444–45, 784 A.2d 545 (2001); *DeLeon Enters., Inc. v. Zaino*, 92 Md.App. 399, 406–07, 608 A.2d 828

(1992). When contract language is open to two reasonable interpretations, the hardship of one such interpretation " 'is strong ground for belief that such a meaning was not intended.' " *See Canaras v. Lift Truck Servs., Inc.*, 272 Md. 337, 357, 322 A.2d 866 (1974) (quoting *Sorensen v. J.H. Lawrence Co.*, 197 Md. 331, 339, 79 A.2d 382 (1951)).

 " 'A waiver is the intentional relinquishment of a known right. . . .' " *Id.* (quoting *Enter. Mfg. Co. v. Oppenheim*, 114 Md. 368, 402, 79 A. 1007 (1911)). The issue in this case is whether the Owner (K.B.K.) waived its right to pursue liability claims against the Contractor (Mattingly) and subcontractors for losses sustained in the future, after the construction was over and paid for and the Restaurant was in operation, so long as the losses at issue were covered by insurance. The meaning of "the Work," as defined and used in the Contract, is not clear. Therefore, upon executing the Contract, it would not have been readily apparent to K.B.K. or to Mattingly or to any reasonable party that "the Work" would comprise not only the steps that the Contract required be taken to perform but also the finished Restaurant itself, after construction and final payment; and it further would not have been readily apparent to K.B.K. (or to any reasonable Owner) that, if it were to obtain property insurance on the finished Restaurant at some time or times in the future, it would be relinquishing its right to pursue liability claims against Mattingly (and the subcontractors) for all time, as long as the property insurance was in effect. Given that lack of clarity in the language of the Contract, and the absence of any other language (such as a Completed Project Insurance clause) to remove the ambiguity, the Contract cannot reasonably be interpreted as a waiver by K.B.K. of its liability rights for damages covered by insurance.[5]

---

5. We note that what would not have been apparent to K.B.K. likewise would not have been apparent to Hartford or any insurer with which K.B.K. contracted to cover the Restaurant for property damage and therefore neither Hartford nor its future insurers would have known to obtain policy endorsements, which would have changed the cost of the insurance policy. The Waivers of Subrogation clause states that insur-

We also agree with Hartford that the public policy consideration behind Waivers of Subrogation clauses in construction contracts pertain to the period of time in which construction is taking place, and not to the (unlimited) period of time after construction and final payment, when the structure is built and being used and the parties no longer are working together to accomplish that. The primary policy consideration is to eliminate the disruption in construction that would result if losses during that time were subject to litigation. When construction is over and the structure is operational, avoiding delays in construction is no longer a goal.

For these reasons, we conclude that the Contract cannot be interpreted to mean that, after the Restaurant was built and paid for, K.B.K. continued to waive its liability rights, and its property insurer's subrogation rights, against Mattingly and the subcontractors, so long as K.B.K. maintained property insurance coverage on the Restaurant.[6]

---

ance policies obtained "shall provide such waivers of subrogation by endorsement or otherwise," but, for the very reasons we have explained, the temporal scope of any such endorsements is unclear.

**6.** As discussed above, the *United H.R.B.* court decided that the subrogation waiver did not continue after the structure had been built and paid for, because the subrogation waiver is a general waiver that is replaced by the more specific final payment waiver exception.

This reasoning has been called into question by at least one expert commentator. In BRUNER & O'CONNOR, *supra*, the authors noted:

One might question the court's analysis of the waiver of subrogation provision as a "general waiver" provision and the final payment waiver as a "specific" provision.[14]

---

14. The "specific"/"general" dichotomy can be a challenge to apply. It is just as reasonable to construe the [Waiver of Subrogation clause] as the more specific, as it pertains only to waivers that arise because of the existence of insurance. From this perspective, the [Final Payment Waiver Exception clause] and its defective work exception are more general, as they apply to all claims once final payment has been made. It is likely that many courts faced with this question would rule the other way.

2 BRUNER & O'CONNOR, *supra*, 5:193, at 332. We agree with this criticism and reject Hartford's argument that we should adopt the reasoning of the court in *United H.R.B.*

JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR CALVERT COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEES.